1

KURT A. KAPPES – SBN 146384
kappesk@gtlaw.com

2

JENNIFER M. HOLLY – SBN 263705
hollyj@gtlaw.com

3

GREENBERG TRAURIG, LLP
1201 K Street, Suite 1100

4

Sacramento, CA  95814-3938
Telephone:  (916) 442-1111

5

Facsimile:  (916) 448-1709

6

Attorneys for Plaintiffs
Pyro Spectaculars, Inc.; Pyro Spectaculars

7

North, Inc.; and Pyro Events, Inc.

8

9

UNITED STATES DISTRICT COURT

10

EASTERN DISTRICT OF CALIFORNIA

11

SACRAMENTO DIVISION

12

13

PYRO SPECTACULARS, INC.; PYRO
SPECTACULARS NORTH, INC.; and PYRO

14

EVENTS, INC.,

Plaintiffs,

15

16

v.

17

STEVEN SOUZA,

Defendant.

18

CASE NO.

**COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF**

1.    Violation of Computer Fraud and
        Abuse Act (18 U.S.C. §1030);
2.    Violation of Penal Code § 502;
3.    Breach of Contract;
4.    Breach of Loyalty;
5.    Breach of the Implied Covenant of
        Good Faith and Fair Dealing;
6.    Misappropriation of Trade Secrets;
7.    Tortious Interference with
        Prospective Economic Relationship
        and Economic Advantage;
8.    Unfair Business Practices; and
9.    Conversion

**JURY TRIAL DEMANDED**

19

20

21

22

23

24

25

26

27

28

Case No.

**COMPLAINT**

1.     Plaintiffs, Pyro Spectaculars North, Inc., Pyro Spectaculars, Inc., and Pyro Events, Inc. (collectively "Plaintiffs" or "PSI"), bring this action against Defendant Steven A. Souza ("Defendant"), a former employee and sales executive for the Company.  As set forth in the recitals below, Defendant has violated a myriad of federal and state laws by misappropriating the Company's sensitive trade secrets and other confidential and proprietary information, and putting such wrongfully-acquired information to improper competitive use.    Defendant, now representing himself as Vice President of J and M Displays's West Coast Region, gained unauthorized access to PSI's computer systems, misappropriated PSI's trade secrets and confidential business information, and shared such information with J and M Displays.

2.     PSI brings this action, among other things, to protect its trade secrets and confidential information, and to seek redress from the harm that Defendant's wrongful conduct has caused and will cause PSI.  PSI seeks an injunction and appropriate order to, as more fully described in the prayer below: (a) enjoin Defendant, as well as those acting in concert with him, from directly or indirectly disclosing or utilizing PSI's confidential, proprietary, and/or trade secret information; (b) require Defendant to return PSI property; (c) require Defendant to account for the whereabouts of PSI's property; (d) enjoin Defendant from inducing or attempting to induce PSI customers to contract with Defendant and/or J and M Displays through use of PSI's confidential, proprietary information.  Because PSI has been and continues to be severely, immediately and irreparably harmed by Defendant's use of its most sensitive business information, PSI respectfully requests that this Court grant the relief it now seeks.

**THE PARTIES**

3.     Plaintiff Pyro Spectaculars North, Inc. is a corporation organized and existing under the laws of the State of California with its principal place of business located at 5301 Lang Avenue, McClellan, California, 95652. Pyro Spectaculars North, Inc.'s Articles of Incorporation were filed with the California Secretary of State on or about March 30, 2007.

4.     Plaintiff Pyro Spectaculars, Inc. is a corporation organized and existing under the laws of the State of California with its principal place of business located at 3196 North Locust

1    Avenue, Rialto, San Bernardino County, California.   Pyro Spectaculars, Inc.'s Articles of

2    Incorporation were filed with the California Secretary of State on or about September 28, 1979.

3           5.      Plaintiff Pyro Events, Inc. is a corporation organized and existing under the laws

4    of the State of California with its principal place of business located in Claremont, California.

5    Pyro Events, Inc.'s Articles of Incorporation were filed with the California Secretary of State on

6    or about January 23, 2004.

7           6.      Defendant, Steven Albert Souza ("Defendant"), is an individual residing in El

8    Dorado County, California.   From November 1, 1995 to January 16, 2012, PSI employed

9    Defendant as an Account Executive and Show Producer.

10                                   **JURISDICTION**

11          7.      This is an action for violation of the Computer Fraud and Abuse Act, 18 U.S.C. §

12   1030 *et seq.*; Violation of California Penal Code § 502; Breach of Contract; Breach of Duty of

13   Loyalty; Breach of the Implied Covenant of Good Faith and Fair Dealing; Misappropriation of

14   Trade Secrets; Tortious Interference with Prospective Economic Advantage; Unfair Competition

15   under California Business and Professions Code § 17200 et seq.; and Conversion.   Original

16   jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1331.   This Court has supplemental

17   jurisdiction over PSI's California state law claims pursuant to 28 U.S.C. § 1367 because the state

18   law claims are related to PSI's federal claim and derive from a common nucleus of operative

19   facts.

20                                      **VENUE**

21          8.      Venue is appropriate in this judicial district under 28 U.S.C. § 1391 and U.S.C.

22   § 84(b) because a substantial part of the acts or omissions giving rise to Plaintiffs' claims

23   occurred here, and because Defendant is subject to personal jurisdiction in this district.

24                          **INTRADISTRICT ASSIGNMENT**

25          9.      Assignment of this action to the Sacramento Division is proper under Civil Local

26   Rule 3-120 in that a substantial part of the events or omissions giving rise to the claims alleged

27   herein occurred in Sacramento and El Dorado Counties.

28   ///

SAC 442,148,274v3 2-3-12

## GENERAL ALLEGATIONS

### Pyro Spectaculars, Inc.'s Business

10.     PSI is one of the largest producer of fireworks displays in the United States.  Pyro Spectaculars North, Inc., Pyro Spectaculars, Inc., and Pyro Events, Inc. have common ownership, officers, and directors.

11.     PSI's success in the commercial market is highly dependent on its established relationships with customers, vendors, and pyrotechnic operators.

12.     PSI employs commissioned sales executives to market and sell pyrotechnic displays and services to its customers.

### Defendant Employment With PSI

13.     On or about November 1, 1995, PSI hired Defendant as a sales Account Executive.  Defendant was hired both to serve PSI's accounts and to seek additional business accounts.  From his hire date on November 1, 1995, until he abruptly resigned, Defendant's job responsibilities included, but were not limited to, the marketing and sales of pyrotechnic operations and show production for Northern California and Hawaii.

14.     On November 8, 1995, PSI and Defendant entered into the Pyro Spectaculars, Inc. Account Executives Duties and Responsibilities - 1994 contract ("Agreement"), containing a confidentiality agreement, discussed below.

### Background

15.     In the fireworks industry, the identity of potential customers is not information which is readily available to the public.  There is no known source from which one can ascertain the identity of persons who display fireworks or who may be interested in purchasing fireworks; instead, the most common and useful way for a new fireworks company to acquire customers would be through "cold-calling," an often lengthy and costly process.[1]  PSI has compiled its list of customers over the decades of its business from advertising, website contacts, publicity, customer referrals, and other sources of leads that have been gathered and forwarded to its account executives, including Defendant, to make a sale for PSI.  Further, lists of pyrotechnic

---

[1] Although some shows are listed on PSI's internet page, they are a small fraction of the shows that PSI performs, and are well-known shows.

1   operators, their experience, training, qualifications and requirements, as well as least expensive,

2   most effective vendors of pyrotechnic equipment and supplies are not readily available to the

3   public.[2]

4         16.     Customer lists are, more importantly, detailed account information, compiled over

5   many years at great expense and countless hours.  The lists include some or all of the following

6   information with regard to each customer: the name, address, and phone number of the customer;

7   the "contact person"; the amount of money previously spent; line item budgets and breakdown

8   costs of the displays the client purchased; and a breakdown of the specific products used in the

9   individual displays, and a listing of every pyrotechnic operator PSI used for different accounts.

10   Other types of trade secrets known to Defendant include, but are not limited to, customer

11   feedback, complaints and customer preferences, site surveys concerning the size of the fireworks

12   that can be shot in the customer's area, notes about how to improve the customer's shows in the

13   future, as well as special requirements, preferences and procedures of the authorities that have

14   jurisdiction over the displays.  Over the past several years, Plaintiffs have embodied their trade

15   secrets and confidential information into computerized lists, accessible via PSI's "Booking

16   Form" program.  The information that PSI has developed at great expense and labor gives PSI a

17   competitive advantage in the industry.  Access to it would allow anyone outside the Company to

18   immediately solicit customers and compete with PSI - without first having to compile the data.

19   It is PSI's policy to keep such data confidential, and employees sign agreements agreeing to do

20   so.

21         17.     Throughout his career at PSI, Defendant enjoyed access to the Company's most

22   sensitive business information, data and documents through the Booking Form program.  Such

23   non-public information would be of extraordinary value to competing concerns, and PSI thus

24   takes pains to ensure and safeguard its secrecy.

25         18.     PSI is keenly aware of the critical importance of protecting the confidentiality of

26   its trade secrets and other proprietary business information.  As a result, the majority of PSI's

27   trade secret information and data are stored on the Company's secure network servers.  PSI

28

---

[2] It is standard in the pyrotechnic industry for companies to protect this confidential information, as evidenced by J and M Displays's policy and practice: http://www.jandmdisplays.com/assets/files/Main_Shooter_Packet_IA.pdf, p. 1.

COMPLAINT                                                                                          Case No.

1   expends significant resources to maintain the security of this data and the integrity of the

2   information technology servers on which it is stored.   PSI takes the security of its business

3   information seriously and maintains up-to-date firewalls.   Every PSI employee must enter a

4   unique user name and password to log on to his or her computer.   Then, each employee must

5   enter a second unique user name and password to log on to the network before using any

6   Company computer.  Finally, to access the Booking Form program, where most of the Company

7   trademark information is stored, the employee must again enter - for a third time - a unique user

8   name and password to log on.   These passwords are subject to minimum complexity

9   requirements.

10         19.     Another means by which PSI protects its trade secrets and confidential and

11   proprietary business information is to enter into legally-binding confidentiality agreements with

12   its employees.  Thus, at the outset of his employment with PSI, on November 8, 1995, PSI and

13   Defendant entered into the Pyro Spectaculars, Inc. Account Executives Duties and

14   Responsibilities - 1994 contract ("Agreement").   A true and correct copy of the Agreement is

15   attached hereto as <u>Exhibit A</u>.   When he signed the Agreement, Defendant agreed to certain

16   restrictions on his conduct both during and after his employment with the Company.  Section 13

17   of the Agreement this provides in pertinent part as follows:

18         Account executives agree that all account or customer lists, trade
            secrets, unique display designs or knowledge gained are the
19         exclusive property of Pyro Spectaculars, Inc. and the Account
            Executive hereby waives any rights therein.  Account Executives
20         further agree that they will not divulge any knowledge, trade
            secrets, formulas, patents or unique display designs to anyone
21         outside Pyro Spectaculars, Inc..

22         20.     Further, at the outset of his employment with PSI, Defendant signed and

23   acknowledged Section 7 of the PSI Employee Handbook, agreeing to safeguard and return to

24   PSI all Company property promptly following the termination of his employment.  Section 7 of

25   the Employee Handbook provides in pertinent part:

26         Employees are responsible for all company property, materials, or
            written information issued to them or in their possession or control.
27         Employees must return all Company property immediately upon
            request or upon termination of employment.  Company may take
28         all action deemed appropriate under the law to recover or protect
            its property issued to employees.

A true and correct copy of the pertinent portions of the Employee Handbook is attached as Exhibit B.

21.    PSI expends extraordinary effort and substantial economic resources to safeguard the secrecy of its business information and the integrity of the information technology systems on which such information is stored.

**Defendant Improperly Acquired PSI's Confidential Information,**

**And Then Abruptly Resigned.**

22.    As a PSI commissioned sales employee, Defendant owed PSI a duty of loyalty including acting for PSI's benefit, protecting PSI's interests, and subordinating his personal interests to those of PSI.

23.    On information and belief, Defendant began planning for his January 14, 2012 resignation from PSI weeks in advance of January 14.   Commencing December, 2011, Defendant began engaging in unusual conduct.

24.    On January 14, 2012, Defendant tendered his resignation with PSI, effective January 16, 2012.  When Assistant Office Manager, Cindy Allie, asked Defendant about his employment plans following his resignation, Defendant informed her that he had no such plans.

25.    However, Defendant immediately thereafter commenced employment with J and M Displays, an Iowa-based corporation, with the intention of taking customers from and competing directly with PSI.  J and M Displays is now in direct competition with PSI and is soliciting several of PSI's customers.

26.    On or about the date of his resignation, Defendant sent out solicitation letters *en masse* to each of PSI's Northern California and Hawaii accounts (presumably using PSI proprietary contact information) informing these accounts that Defendant has joined "J& M Displays West as Vice President of the West Coast Region" and "greatly appreciated [their] professional and personal relationship in the past and [looks] forward to discussing this new opportunity with [the account]."   PSI Executive Vice President, Ian Gilfillan, received numerous copies of solicitation letters from various PSI customers on January 19, 2012.

27.    On or about January 2012, PSI discovered that, in December 2011, Defendant,

1  while still employed as an account executive with PSI and in breach of his duty of loyalty to it,

2  requested that Mark Silveira, in his capacity as Madera Facilities Manager, inform him who the

3  vendor was that sold PSI their fireworks racks.  Racks hold the tubes that are used to discharge

4  fireworks.  Defendant informed Silveira he needed between five and ten thousand racks, a

5  tremendous amount, and alleged he was starting his own company and was looking for a

6  supplier.

7  **Conversion and Interruption of PSI's Business**

8      28.     On or about January 17, 2012, Stephanie Walker, a clerk in accounts payable for

9  PSI, contacted AT&T, the provider of Defendant's  PSI office voice telephone line and office

10 facsimile line, to request the lines be transferred back to PSI equipment.  While Defendant

11 utilized those lines during his employment with PSI, PSI was the account holder and directly

12 received and paid for the AT&T bills connected with those lines.  Subsequent to his

13 resignation, Defendant retained and failed to return the Company-provided facsimile line

14 despite PSI's requests.

15     29.     On or about January 19, 2012, Ms. Walker escalated the account to PSI Human

16 Resources Manager, Paul Colvin, as AT&T had informed Ms. Walker that they were unable to

17 transfer the facsimile line because Defendant's wife, Sherry Souza, had already transferred the

18 facsimile line to a personal account.   When Mr. Colvin contacted AT&T, the AT&T

19 representative informed Mr. Colvin that on or about January 12, 2012, Sherry Souza, called

20 AT&T to transfer both PSI lines to Defendant's personal numbers.  The AT&T representative

21 informed Mr. Colvin that the office voice number could be transferred back to another PSI

22 number, but that the facsimile line could not as Sherry Souza had password-protected the line.

23 Mr. Colvin requested that the office voice line be transferred and the AT&T representative

24 agreed to do so.

25     30.     On January 20, 2012, Mr. Colvin tested the office voice line to see if it was still

26 working.   It was not.   When Mr. Colvin contacted AT&T a second time, an AT&T

27 representative went through the process again of transferring the office voice line back to PSI

28 equipment.

SAC 442,148,274v3 2-3-12

31.     Later on January 20, 2012, PSI employee, Kevin Gilfillan, called the office voice line and Defendant answered the phone.  Mr. Colvin contacted AT&T a third time, and a representative informed him that Sherry Souza had called AT&T again to transfer the PSI office voice line to Defendant's personal account.  Mr. Colvin re-transferred the office voice line once more to a new PSI line, and password protected the line to prevent further misuse.  Mr. Colvin was unable to regain possession of the PSI facsimile line, and Defendant continues to intercept fax communications intended for PSI.  Defendant continues to refuse to return use of the facsimile line, despite PSI's requests that he do so.

### Computer Theft

32.     On or about January 25, 2012, PSI discovered that, on January 14, 2012, Defendant, while still employed as a commissioned account executive with PSI and in breach of his duty of loyalty to it and while acting as an agent of J & M Displays, intentionally accessed his assigned PSI computer, attached a 60 gigabyte Western Digital external hard drive, and transferred at least 60 PSI sensitive and confidential, proprietary documents - without Company authorization or in excess of his authorization - including customer lists, pricing lists, proposals, site plans, operation manuals, operation procedures, customer contracts, supplier and vendor lists, pyrotechnic operator lists, records, histories, qualifying information, and design script files.  Defendant then attached four additional, separate memory flash USB drives and transferred the same files.

33.     On January 14, 2012, Defendant then installed "Disk Redactor," a free wiping software, on his assigned PSI computer, and deleted and/or attempted to delete, write over, and wipe over 300 computer files from the computer.  As an example, Defendant's cellular phone, which was reimbursed by PSI in order to facilitate his marketing endeavors with PSI, was backed up through his iTunes account on his assigned PSI computer.  Defendant deleted his iTunes account from his computer, then used "Disk Redactor" to wipe and write over the iTunes file with a sequence of "0's."

34.     Upon information and belief, Defendant has also misappropriated confidential and proprietary data and trade secrets embodied in physical files of PSI, including but not

1   limited to documents containing highly sensitive financial information, such as bookings forms,

2   contracts and proposals.  Upon PSI's request, on January 27, 2012, Defendant returned eight

3   boxes of Company documents dated from 2002 through 2010, which were immediately

4   indexed.   As examples, Defendant's "2007" box contained 941 documents.   Defendant's

5   "2008" box of documents contained 1752 pages of confidential Company documents.

6   Conversely, there were only 848 documents for the combined years of 2009/2010 and no box

7   was delivered entitled "2011."  These files were mostly historical data and did not contain any

8   current documents believed to be in Defendant's possession, including, but not limited to, files

9   related to the City of Elk Grove, California State Fair, Sacramento River Cats, City of

10   Vacaville, Modesto Nuts Professional Baseball, Kirkwood Ski Resort, Sugar Bowl Ski Area,

11   Bear Valley Ski Company, Bill McAnally Racing, etc.   Defendant failed to return these

12   materials to PSI when he resigned, in violation of Company policy.

13        35.     Further, while Defendant returned his 2011 PSI-assigned laptop, he failed to

14   return the laptop PSI assigned to him in 2002.  That laptop, which Defendant used during his

15   employment with PSI, has over nine years worth of PSI's confidential, proprietary data stored

16   on it, as Defendant had access to PSI's Booking Form program with this computer.

17        36.     Upon information and belief, in further violation of his fiduciary duty and duty

18   of loyalty, since his resignation, Defendant has continued to usurp corporate opportunities

19   attempting to use Plaintiff's confidential and proprietary information to contact PSI clients,

20   vendors and pyrotechnic operators in order to build his business under J & M Displays.  Upon

21   information and belief, Defendant has already submitted multiple financial proposals to PSI

22   clients, having used PSI confidential, proprietary information as the basis of this proposals.

23        37.     The pyrotechnic industry operates on extremely thin profit margins.  As a result,

24   every operational advantage, such as PSI's economically efficient supply chain, is a jealously

25   guarded business secret.  The information misappropriated by Defendant includes operational

26   data and strategic planning materials that would enable a competitor to replicate PSI's

27   successful operation without any of the substantial investment of time and resources required to

28   develop such successful business models.  In sum, Defendant now possesses a wide variety of

1  trade secrets and other confidential and proprietary business information belonging to PSI -

2  information that will endow a competitor like J & M Displays with significant competitive

3  advantage relative to the Company.

4          38.     Due to his many years of experience with PSI, Defendant knew before he took

5  the business information belonging to PSI that it would be of enormous competitive value to

6  other pyrotechnic operations companies seeking to serve the same clientele as PSI.

7          39.     In his new role as Vice President of the West Coast Region of J and M Displays

8  which, to PSI's information and belief, had previously not done business in the California and

9  Hawaii markets, it is inevitable that Defendant will be called upon and have occasion to use or

10  disclose confidential and proprietary information of PSI in his knowledge or possession as he

11  seeks to position his new employer's operations against PSI's in an extremely competitive

12  marketplace.

13         40.     Defendant's actions threaten PSI with serious, competitive harm.

14                          **FIRST CLAIM FOR RELIEF**

15  **VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030)**

16         41.     Plaintiff hereby realleges and incorporates by reference each and every

17  allegation contained in paragraphs 1 - 39 of the Complaint.

18         42.     PSI's servers are protected computers that are used in or affect interstate

19  commerce.

20         43.     In or about January 2012, Defendant, while still employed as a commissioned

21  sales person with PSI and in breach of his duty of loyalty to it and while acting as an agent of J

22  & M Displays, intentionally accessed his assigned PSI protected computer in excess of his

23  authorized access.

24         44.     Defendant connected multiple computer hard drives and flash drives, and

25  transferred PSI confidential, proprietary information, in the sum of over 60 confidential files

26  and documents.

27         45.     Defendant then deleted from the PSI protected computer over 300 files

28  containing PSI work product.   He also downloaded computer wiping software, "Disk

1    Redactor," to wipe and overwrite files from his assigned PSI computer without authorization.

2           46.     Further, as detailed above, *after his resignation*, Defendant usurped PSI's

3    facsimile and voice phone lines with the intent to intercept communications directed to PSI.

4    On or about January 16, 2012, Stephanie Walker, a clerk in accounts payable for PSI, contacted

5    AT&T, the provider to Defendant's PSI-assigned office voice and facsimile lines, to request the

6    lines be transferred back to PSI equipment.   On or about January 19, 2012, Ms. Walker

7    escalated the account to PSI Human Resources Manager, Paul Colvin, as AT&T had informed

8    Ms. Walker it was unable to transfer the lines.   An AT&T representative then informed Mr.

9    Colvin that on or about January 12, 2012, Defendant's wife, Sherry Souza, called AT&T to

10   transfer both PSI lines to Defendant's personal numbers.   The AT&T representative informed

11   Mr. Colvin that the office voice number could be transferred back to another PSI number, but

12   that the facsimile line could not as Sherry Souza had password-protected the line.   Mr. Colvin

13   requested that the office voice line be transferred and the AT&T representative agreed to do so.

14          47.     On January 20, 2012, Mr. Colvin tested the office voice line to see if it was still

15   working.   It was not.   When Mr. Colvin contacted AT&T a second time, an AT&T

16   representative went through the process again of transferring the mobile phone line back to

17   another PSI number.

18          48.     Later on January 20, 2012, PSI employee, Kevin Gilfillan, called the office

19   voice line and Defendant answered the phone.   Mr. Colvin contacted AT&T a third time, and a

20   representative informed him that Sherry Souza had called AT&T again to transfer the PSI

21   office voice line to Defendant's personal account.   Mr. Colvin had AT&T re-transferred the

22   office voice line once more to PSI equipment, and password protected the line to prevent

23   further misuse.   Mr. Colvin was unable to regain possession of the PSI facsimile line as a result

24   of the actions of Defendant and Sherry Souza, and Defendant continues to intercept fax

25   communications intended for PSI.   Defendant refuses to return use of the facsimile line, despite

26   PSI's requests that he do so.

27          49.     These actions constitute a violation of 18 U.S.C. sections 1030(a)(2)(C);

28   1030(a)(4); and 1030(a)(5)(A)-(C).

50.     PSI has retained the use of a computer forensics expert to retrieve the data deleted, wiped and transferred from its computer.

51.     As a result of Defendant's unauthorized access of PSI's computer files and private communications while working as an agent of J & M Displays, PSI is informed and believes, and thereon alleges, that it has suffered damages in the past year of at least $5,000.00 and anticipates that it will continue to suffer damages for, among other things, the (i) expenses paid to a computer forensics expert for assessing the damages done to PSI's computer when Defendant transferred, deleted and wiped files from it and determining whether those files could be recovered, and (ii) retaining counsel to bring this case, and (iii) the amount of business lost by PSI's inability to access those files and communications.

52.     PSI is entitled to compensatory damages for the economic losses directly and proximately caused by Defendant's violations of 28 U.S.C. section 1030.

## SECOND CLAIM FOR RELIEF

## VIOLATION OF PENAL CODE § 502

53.     Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 39 of this Complaint.

54.     PSI maintains and owns a computer network, computer programs, or software and a computer system as those terms are defined in the California Penal Code section 502 (collectively "Computer System"), and which includes the computers and network provided by PSI to Defendant while he was employed by PSI.  On its Computer System, PSI maintains its data, including its confidential, proprietary and trade secret information.

55.     PSI is informed and believes and thereon alleges that Defendant knowingly and without permission or exceeding permission, accessed PSI's Computer System and the property and data contained therein; and took, copied, and thereafter made use of data and supporting documentation from PSI's Computer System.  Defendant did these acts knowingly and without permission under the California Penal Code section 502 and in violation of PSI's express computer usage policies which he agreed to follow.  Defendant then installed and ran a free program, "Disk Redactor," to overwrite and delete all evidence of his misdeeds in derogation of

his legal obligations under the statute.  He acted for the benefit of a competitor and/or his own personal interests and therefore, his actions were "without permission."  Defendant's actions violated PSI's policies, including, but not limited to, PSI's Employee Handbook and the Pyro Spectaculars, Inc. Account Executives Duties and Responsibilities - 1994 contract.

56.     PSI is informed and believes, and thereon alleges, that Defendant engaged in these actions knowingly and intentionally, and for the purposes of wrongfully obtaining and controlling PSI's property and data.

57.     PSI is informed and believes and thereon alleges that Defendant's conduct violates California Penal Code section 502, including, without limitation, California Penal Code section 502(c)(1), (2), (3), (6) and (7).

58.     As an actual and proximate cause of Defendant's conduct, PSI has suffered actual and/or consequential damages in an amount to be proven at the time of trial, but in excess of the minimum jurisdictional amount of this Court.

59.     PSI is informed and believes and on that basis alleges that after knowingly accessing PSI's Computer System and PSI's confidential and proprietary information without authorization or permission, or exceeding authorization or permission, Defendant retained some or all of the property and data and other information that he obtained from his unlawful conduct.  Accordingly, PSI is entitled to injunctive relief and other equitable relief, including, without limitation, permanent injunctive relief, restitution, and disgorgement of any and all profits or other benefits that Defendant has obtained in connection with his illegal conduct.

60.     PSI is informed and believes and on that basis alleges that each of the aforementioned acts was done willfully and maliciously, with the deliberate intent to injure PSI and with conscious disregard of PSI's rights, justifying the award of exemplary and punitive damages.

### THIRD CLAIM FOR RELIEF

### BREACH OF WRITTEN CONTRACT

61.     Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 39 of this Complaint.

SAC 442,148,274v3 2-3-12

62.     The Pyro Spectaculars, Inc. Account Executives Duties and Responsibilities - 1994 contract ("Agreement") constitutes a valid and binding contract between PSI, on the one hand, and Defendant, on the other hand, supported by valuable consideration.   The confidentiality covenants and other provisions contained in the Agreement are reasonably necessary to protect legitimate protectable interest in confidential, proprietary and trade secret information, customer relationships, work force and goodwill.   Further, the Employee Handbook, which Defendant signed and acknowledged during his employment, provides that Defendant must return all Company property immediately upon termination of his employment.

63.     PSI fully performed its obligations under the Agreements or has been excused therefrom.

64.     Defendant has breached and continues to breach the Agreements by:

(a)     Obtaining without authorization, or in excess of his authorization, PSI's confidential, proprietary and/or trade secret information in violation of the Agreement;

(b)     Failing to return PSI property in violation of the Employee  Handbook;

(c)     Utilizing PSI's confidential, proprietary and/or trade secret information to benefit PSI's competitor, J and M Displays;

65.     Upon information and belief, Defendant fraudulently concealed his breach by deleting, wiping and writing over the files evidencing his misappropriation of confidential customer information, in violation of the contract.

66.     As a result of any one of these breaches, PSI has been injured and faces irreparable injury.  PSI is threatened with losing customers, its competitive advantage, its trade secrets and good will in amounts which may be impossible to determine, unless Defendant is enjoined and restrained by order of this Court.   PSI seeks damages against Defendant, according to proof.

## FOURTH CLAIM FOR RELIEF
## BREACH OF DUTY OF LOYALTY

67.     Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 39 of this Complaint.

68.     As PSI's commissioned account executive, Defendant owed PSI a duty of care, diligence, skill and loyalty to PSI, including acting for PSI's benefit, protecting PSI's interests, and subordinating his personal interests to those of PSI.

69.     Defendant breached is duty to PSI as a result of the acts alleged herein, including, but not limited to: (1) obtaining without permission and without authorization or in excess of his authorization PSI's data, including confidential and proprietary information (regardless of whether it rises to the level of a trade secret) that he intended to use during his employment with PSI's competitor, J and M Displays, and with the intent to unfairly compete with PSI after he left his employment with PSI; (2) using PSI's time and resources to plan his move to J and M Displays; and (3) using his status for his own benefit and his future move to J and M Displays in his interactions with customers and fellow employees.

70.     As a direct and proximate result of Defendant's breach of his duty owed to PSI, PSI has suffered damages in an amount to be determined in accordance with proof at trial

71.     Defendant's actions were willful, wanton, malicious, oppressive, and undertaken with the intent to defraud PSI, and justify the award of exemplary and punitive damages.

## FIFTH CLAIM FOR RELIEF

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

72.     Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 39 of this Complaint.

73.     The Pyro Spectaculars, Inc. Account Executives Duties and Responsibilities - 1994 contract ("Agreement") constitutes a valid and binding contract between PSI, on the one hand, and Defendant, on the other hand, supported by valuable consideration.  PSI fully performed its obligations thereunder or has been excused therefrom.

74.     Implied in the parties' contract was a covenant that the parties would deal with each other in good faith and would not engage in any conduct to deprive the other of the benefit of the agreement.

75.     Defendant failed to perform his obligations under the Agreement in good faith by knowingly, intentionally, and in bad faith downloading, transferring, and then deleting and

1    wiping PSI confidential, proprietary files and documents from his PSI assigned laptop before

2    his resignation, and transferring those documents to himself and his new employer.

3        76.    As a direct and proximate result of Defendant's knowing, intentional, and bad

4    faith breach of the parties' contract's implied covenant of good faith and fair dealing, PSI has

5    suffered damages in an amount to be determined at trial.

6                        **SIXTH CLAIM FOR RELIEF**

7                   **MISAPPROPRIATION OF TRADE SECRETS**

8        77.    Plaintiffs re-allege and incorporate herein by reference the allegations contained

9    in paragraphs 1 through 39 of this Complaint.

10       78.    At all relevant times, PSI was in possession of trade secret information as

11   defined by California's Uniform Trade Secrets Act ("CUTSA"), Civil Code section 3426.1(d),

12   which consisted of, inter alia, its customer lists, pricing lists, proposals, site plans, operation

13   manuals, operation procedures, customer contracts, supplier and vendor lists, pyrotechnic

14   operator lists, records, histories, qualifying information, and design scripting software files.

15       79.    As described above, Defendant was provided access to such trade secrets in his

16   position as Account Executive in PSI's Northern California and Hawaii markets.   PSI's

17   proprietary business and customer information that Defendant was provided access to

18   constitutes trade secrets because PSI, as described herein, derives independent economic value

19   from that information, such information is not generally known nor readily ascertainable by

20   proper means by other persons who can obtain economic value from its disclosure or use, and

21   because the information is the subject of reasonable efforts to maintain its secrecy.

22       80.    PSI's customer list was more than a mere compilation of customer names.   The

23   customer list is a compilation developed over decades that had economic value not only in that

24   it contained the identifying information about PSI's customers, including contact information,

25   but also the complete "booking forms" which also included which products and plans those

26   customers purchased in the past, the financial line item breakdowns, and individual detail of the

27   products the customers purchased, etc..   Such a list therefore provides not only the name of a

28   PSI customer, but would allow a competitor to know exactly what proposal would be necessary

1    to undercut PSI's proposal with similar products, the cost breakdown of the displays that the

2    customer had previously purchased, as well as the individual products necessary to create the

3    same fireworks display that the customer had purchased in the past.

4        81.    PSI kept this information, including the booking forms, unknown to others, and

5    took steps to keep this information secret through the following means:

6        (a)    Controlled access to company information through network security

7    measures designed to limit access through complex identities and passwords;

8        (b)    Limited access to company servers through strict controls over web

9    access and internal access by the same methods and additional measures for login and identity

10   of authorized personnel;

11       (c)    Anti-hacker and anti-spyware software to prevent unauthorized access to

12   web/internet access; and

13       (d)    Confidentiality agreements with show producers who are required to use

14   company software to access confidential information to generate proposals and service existing

15   customers.

16       82.    PSI's vendor list has economic value in that it described the businesses from

17   whom PSI purchased its pyrotechnic products.  This list contains vital information as to the

18   owners, price guides, and use of products produced.  PSI kept this list unknown to others, and

19   took steps to keep this information secret by ensuring access to computerized data was

20   controlled through separate keywords, access IDs, passwords and related access information.

21   Defendant was familiar with all of the access points and contact information.  It is understood

22   that Defendant maintains all information regarding all PSI vendors in computerized and printed

23   records in his possession.

24       83.    PSI's pyrotechnic operator list has economic value in that it described the

25   operators with whom PSI performed business.  This list contains vital information as to which

26   pyrotechnic operators were qualified in the area to perform services for PSI, records, histories

27   and qualifying information, information relating to the relationships the different pyrotechnic

28   operators had with local fire marshals.  This list is sensitive to PSI because, for example,  PSI

1    can only put on as many Fourth of July shows as it has operators, which are hard to come by.

2    A competitor with this information would not only know how to directly contact the operators

3    that PSI has relationships with, but would know the nature of the operators' relationships with

4    certain customers, with certain fire marshals, and would know what would be necessary to

5    entice the operators to sign with them rather than with PSI.  PSI kept this list unknown to

6    others, and took steps to keep this information secret by ensuring access to computerized data

7    was controlled through separate keywords, access IDs, passwords and related access

8    information.  Defendant was familiar with all of the access points and contact information.  It is

9    understood that Defendant maintains all information regarding all PSI operators in

10    computerized and printed records in his possession.

11      84.      Despite PSI's demand for the return of all confidential and proprietary files to it,

12    Defendant has failed to return these files.  While, after PSI's demand, Defendant did produce

13    eight boxes of confidential documents in his possession on January 27, 2012, these files were

14    mostly  historical data and did not contain any current documents believed to be in Defendant's

15    possession, custody or control, including, but not limited to, files related to the City of Elk

16    Grove, California State Fair, Sacramento River Cats, City of Vacaville, Modesto Nuts

17    Professional Baseball, Kirkwood Ski Resort, Sugar Bowl Ski Area, Bear Valley Ski Company,

18    Bill McAnally Racing, etc.

19      85.      Defendant has and will continue to wrongfully use PSI's trade secrets unless

20    enjoined.  Defendant's wrongful conduct in misappropriating PSI's customer, vendor and

21    pyrotechnic operator lists, unless and until enjoined and restrained by order of this court, will

22    cause great and irreparable injury to Plaintiff's business in that PSI may lose significant

23    business before this action can be brought to trial.  PSI is in the process of initiating contracts

24    for the Fourth of July season, the biggest season for fireworks displays.  Defendant, by his

25    fraudulent and deceitful conduct to date, has demonstrated that he cannot be counted on to

26    avoid disclosing and utilizing PSI's trade secrets.

27      86.      As a direct and proximate result of Defendant's wrongful conduct, PSI has been

28    damaged in an amount to be determined at trial.

87.    Plaintiff is informed and believes and on that basis alleges that Defendant's aforementioned acts were willful, oppressive, fraudulent and malicious in that Defendant misappropriated PSI's lists with the deliberate intent to injure PSI's business and improve his own position in the industry.  Plaintiff is therefore entitled to punitive damages.

88.    Plaintiff has no adequate remedy at law for the injuries currently being suffered, or which it may suffer, in that Defendant will continue to misappropriate PSI's trade secrets and Plaintiff would be required to maintain a multiplicity of judicial proceedings to protect its interests.

## SEVENTH CLAIM FOR RELIEF

## TORTIOUS INTERFERENCE WITH ECONOMIC RELATIONSHIP

## AND PROSPECTIVE ECONOMIC ADVANTAGE

89.    Plaintiff hereby realleges and incorporates by reference each and every allegation contained in paragraphs 1 - 39 of the Complaint.

90.    PSI's relationship with its customers is advantageous to PSI.  There exists a probability of future economic benefit to PSI from its business relationship with its customers.

91.    PSI is informed and believes and on that basis alleges that Defendant intentionally interfered with PSI's business relationship that existed between PSI and at least one of its customers.

92.    Defendant's intentional wrongful conduct, including his breach of the duty of loyalty to PSI while in its employ, and his violation of the Computer Fraud and Abuse Act, was intended to, and did, disrupt the economic relationships between PSI and at least one of its customers.

93.    As a direct and proximate result of Defendant's conduct, PSI has suffered damages in an amount to be determined at trial.

94.    In doing the acts herein alleged, Defendant acted with oppression, fraud, malice, and in conscious disregard of the rights of PSI, and PSI is therefore entitled to punitive damages according to proof at the time of trial.

///

SAC 442,148,274v3 2-3-12

**EIGHTH CLAIM FOR RELIEF**

**UNFAIR COMPETITION (Cal. B & P Code § 17200 *et seq.*)**

95.     Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 39 of this Complaint.

96.     California Business and Professions Code section 17200 *et seq.* prohibits unfair competition in the form of any unlawful, unfair, or fraudulent business practice.

97.     Whether or not PSI's confidential and proprietary information rises to the level of trade secrets, Defendant violated Section 17200 of the California Business and Professions Code by diverting PSI's relationship with its customers, vendors and pyrotechnic operators to J and M Displays, in part by improperly copying, removing and using PSI's property, including its confidential and proprietary information.

98.     As set forth above, Defendant's conduct is unlawful, unfair,  and fraudulent.

99.     Accordingly, Defendant has committed unlawful, unfair or fraudulent acts as defined in California Business and Professions Code section 17200.

100.    Defendant's conduct is intentional, and Defendant is fully aware that it is illegal, unfair and fraudulent.

101.    Defendant is fully aware of the harm (both financial and otherwise) that his conduct has caused, and continues to cause, Plaintiffs.

102.    As a result of the foregoing, Plaintiffs will suffer immediate and irreparable harm, and have suffered, and will continue to suffer, harm including harm that cannot be adequately compensated by money damages.  Further, Defendant has been unjustly enriched in an amount to be proven at the time of trial, entitling PSI to restitution and/or other equitable relief.

**NINTH CLAIM FOR RELIEF**

**CONVERSION**

103.    Plaintiffs re-allege and incorporate herein by reference the allegations contained in paragraphs 1 through 39 of this Complaint.

104.    Based   on   conduct   wholly   independent   of   the   existence,   knowledge,

1    misappropriation and usage of PSI's trade secrets, Defendant removed and retained non-trade

2    secret but still proprietary and confidential information and/or other property belonging to PSI,

3    without authorization, or in excess of his authorization, for his personal economic advantage

4    and, upon information and belief, to use for the benefit of a competitor to unfairly compete with

5    PSI.

6         105.    As a proximate result of Defendant's removal and retention of non-trade secret

7    but still proprietary and confidential information and property, Defendant has caused PSI to

8    suffer damages in an amount to be proven at trial.

9         106.    Each of the acts of conversion by Defendant was done willfully and

10   maliciously, with the deliberate intent to injure PSI's business, thereby entitling PSI to

11   exemplary damages and/or attorneys' fees to be proven at trial.

12                                   **PRAYER**

13        WHEREFORE, Plaintiffs pray for judgment as follows:

14        1.      For damages in an amount according to proof at trial;

15        2.      For restitution and/or disgorgement of all money, profits, compensation or

16   property Defendant has acquired or will acquire by any wrongful or unlawful means or as a

17   result of his breach of loyalty;

18        3.      For the imposition of a constructive trust on all profits and/or monies Defendant

19   wrongfully obtained;

20        4.      For an order requiring Defendant to show cause, if any he has, why he should

21   not be enjoined as set forth below, during the pendency of this action;

22        5.      For an order requiring Defendant, as well as those acting in concert with him, as

23   part of a writ of replevin, within 24 hours of notice to Defendant or his counsel of the terms of

24   this Order, to:

25             (1) return all PSI trade secrets and confidential information;

26             (2) return all PSI property;

27             (3) return and provide access to any and all media and electronic storage devices

28                 and virtual repositories containing any PSI property including, but not limited

1    to, any portable USB storage devices and any other external hard drives used by

2    him;

3    (4) produce any and all electronic devices operated or used by Defendant, as well as

4    those acting in concert with him, for inspection and imaging, to verify the use,

5    access, disclosure, printing, copying, and return of PSI property;

6    (5) produce any and all online storage areas utilized by Defendant, as well as those

7    acting in concert with him, for inspection. to verify use, access, disclosure,

8    printing, copying, and return of PSI property;

9    6.    For an order for expedited discovery to verify the use, access, disclosure,

10   printing, copying, and return of PSI property;

11   7.    For a temporary restraining order, a preliminary injunction, and a permanent

12   injunction, requiring Defendant, his agents, servants and employees, and all persons, acting

13   under, in concert with, or for him:

14   (a)    to refrain from using PSI's confidential information to solicit any

15   business from, or initiate any further contact with, any customer of PSI whom Defendant

16   served at PSI, and/or any prospective customers or any customers whose identities he learned

17   as a result of his employment with PSI (the "Customers"), including for the purpose of advising

18   any Customers of his new affiliation with J and M Displays or for the purpose of inviting,

19   encouraging, or requesting the transfer of any Customer contracts or accounts from PSI to J and

20   M Displays;

21   (b)    to refrain from continuing the misappropriation of PSI's trade secrets by

22   ongoing use or disclosure of PSI's proprietary information, including, but not limited to, in any

23   communications with customers;

24   (c)    to refrain from destroying, erasing or otherwise making unavailable for

25   further proceedings in this matter, any records or documents (including data or information

26   maintained in computer files or other electronic storage media) in Defendant's possession,

27   custody or control which were obtained from, or contain information derived from, any PSI

28   records, which pertain to PSI's customers, or which relate to any of the events alleged in the

1   Complaint in this action; and

2           (d)    to return all copies of PSI's trade secrets, as described in this Complaint;

3       8.    For a temporary restraining order, a preliminary injunction, and a permanent

4   injunction, all enjoining Defendant, his agents, servants and employees, and all persons, acting

5   under, in concert with, or for him from making any false representations to any persons or

6   businesses Defendant knows to have business relationships with Plaintiffs;

7       9.    For the Court to declare the legal rights and duties that exist between Plaintiffs

8   and Defendant, and each of them;

9       10.    For exemplary and punitive damages in an amount to be determined as

10  appropriate to punish Defendant and deter like conduct;

11      11.    For prejudgment and post judgment interest at the maximum legal rate, as

12  provided by the laws of California, as applicable, as an element of damages which PSI has

13  suffered as a result of the wrongful and illegal acts complained of herein;

14      12.    For reasonable attorneys' fees and costs; and

15      13.    For such other and further relief as the Court may deem just and proper.

16  **DEMAND FOR JURY TRIAL**

17      Plaintiffs PSI, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, demand

18  trial by jury as to all legal matters contained in the Complaint.

19

20  Dated:  February 3, 2012               GREENBERG TRAURIG, LLP

21

22

23                           By:  /s/ Kurt A. Kappes _____
                               Kurt A. Kappes

24                                 Jennifer M. Holly
                               Attorneys for Plaintiffs, Pyro

25                                 Spectaculars, Inc.; Pyro Spectaculars
                               North, Inc.; and Pyro Events, Inc.

26

27

28

**EXHIBIT A**

## IO SPECTACULARS, INC.
## ACCOUNT EXECUTIVES
## DUTIES AND RESPONSIBILITIES - 1994

General

Each full-time Account Executive of PYRO SPECTACULARS, INC. will be fully responsible for handling, maintaining and servicing their assigned accounts, displays and territories. He/She shall offer complete and professional services consistent with the image of Pyro Spectaculars, Inc. creating the highest degree of showmanship, safety and performance.

Responsibilities

1) Handle, maintain and service each assigned account. Each Account Executive is responsible and accountable for all sales and production services for each display. Phone calls are to be made and returned in a timely manner. A personal visit to each account is encouraged on an annual basis.

2) All necessary paperwork is to be handled in a timely manner and in accordance with standard office procedures. This shall include current and complete Booking Forms, Plot Plans and any special display instructions and/or requirements.

3) Collect all deposits and payments as per signed contracts. Each Account Executive shall be responsible for all past due collections including small claims court actions.

4) Communication with pyrotechnicians as to specific display requirements, i.e. safety concerns, customer expectations, plot plans, display designs, etc.

5) Cultivate and maintain good fire service relations.

6) Follow up on all potential clams must begin within 48 hours of an incident.

7) Conduct and/or participate in pyrotechnic training seminars.

8) Attend necessary trade shows, conventions and association meetings. Work with the Marketing Director and Sales Manager on all marketing campaigns.

9) Display Production responsibilities including music and narration selection, display design, shell and product selections and cue sheets. A full time recording engineer will be available and all production work must be completed in a timely manner and within approved budgets. Account Executives are encouraged to use custom programs and packages that will be made available.

Page 1

PYRO SPECTACULARS, INC.
ACCOUNT EXECUTIVES
DUTIES AND RESPONSIBILITIES - 1994

10) Good customer relations shall be maintained at all times including post display follow-up.

11) Each Account Executive is expected to establish annual goals and sales objectives with their immediate manager.

12) Account executives agree that all account or customer lists, trade secrets, unique display designs or knowledge gained are the exclusive property of Pyro Spectaculars, Inc. and the Account Executive hereby waives any rights therein. Account Executives further agree that they will not divulge any knowledge, trade secrets, formulas, patents or unique display designs to anyone outside Pyro Spectaculars, Inc.

13) Each Account Executive agrees, in the event they leave the employment of Pyro Spectaculars, Inc., they will not compete directly or indirectly with Pyro Spectaculars, Inc. This non-competition agreement applies to any existing area in which Pyro Spectaculars operates and shall be for a period of three (3) years.

# PYRO SPECTACULARS, INC.
## ACCOUNT EXECUTIVES
### DUTIES AND RESPONSIBILITIES - 1994

## TYPES OF ACCOUNTS

Corporate Accounts

"Hallmark" accounts with shows of National and International status representative of Pyro Spectaculars' corporate profile.

House Accounts

Customers or accounts designated by management to be handled by "in-house" staff.

Assigned Accounts

Accounts assigned to each Account Executive by the president, sales manager or division manager.

Service Accounts

Corporate, House or Third Party accounts that require the assistance of an Account Executive in production or special services.

New Accounts

Accounts developed or created by Account Executives.

Competitive Accounts

Existing accounts currently being serviced by a competitor that an Account Executive acquires.

Special Accounts

Specialty type accounts such as; indoor, custom manufacturing, product sales, theatrical, Special Effects, Theme Park, TV and motion picture.

## PYRO SPECTACULARS, INC.
## ACCOUNT EXECUTIVES
## DUTIES AND RESPONSIBILITIES - 1994

### COMPENSATION

**Salary and Wages**
All Account Executives will receive a minimum annual salary of $5,000.00.

**Draw**
Account Executives that are entitled to commissions may receive a monthly draw against those commissions.

**Commission Rates**

| | |
|---|---|
| Assigned Accounts (including normal and standard services; Insurance, operator fees, delivery and sales taxes) | 5% of contract price |
| Corporate, House, and Service Accounts | 1% of contract price. |
| New and Competitive Accounts (In first year only) | 7.5% of contract. |
| Special Accounts | On a case by case basis |

**Fees**
Operator Fee -
When display is on Saturday, Sunday, Holiday or July 4th regular operator fee will be paid
When display is any other day, a maximum of $75.00 will be paid for display day only.

**Benefit package**
Unless otherwise specified, all full time Account Executives will receive the following benefits:
a. Standard Medical Benefit Package or equivalent as provided by Pyro Spectaculars, Inc.
b. Expenses as approved by management.
c. Car allowance. Pyro Spectaculars, Inc. will re-imburse each Account Executive at the rate of $400 per month for mileage driven on Pyro Spectaculars, Inc. related business.
d. Car phones. Pyro Spectaculars, Inc. will re-imburse each Account Executive for the actual cost of necessary calls made on behalf of Pyro Spectaculars, Inc. and one-half of the basic monthly service rate.

**PYRO SPECTACULARS, INC.**
**ACCOUNT EXECUTIVES**
**DUTIES AND RESPONSIBILITIES - 1994**

    e. Pyro Spectaculars, Inc. profit sharing plan.
    f. Commissions are due and payable on or before December 15th of
       each year as follows:
         1. On accounts paid in full prior to October 31st each year or
           within 30 days of display date; full commission will be paid in
           current year.
         2. On accounts paid in full (with interest) between November 1st
           and December 31st each year; full commission will be paid in
           current year.
         3. On accounts paid in full (without interest) between November
           1st and December 31st each year; 50% commission will be
           paid in current year.
         4. On accounts paid in full (with interest) after December 31st;
           commission will be paid in full in year final payment is
           received.  On accounts paid in full (without interest) after
           December 31st; no commission will be paid.

I have read, understand and have received a copy of this agreement and I agree to
abide by all terms and conditions as outlined.

_____
Account Executive

11 - 8 - 95
Date

_____
Pyro Spectaculars, Inc.

11 - 8 - 95
Date

Page 5

**EXHIBIT B**

For purposes of this policy, a relative is any person who is related by blood or marriage, or whose relationship with the employee is similar to that of persons who are related by blood or marriage. A dating relationship is defined as a relationship that may be reasonably expected to lead to the formation of a consensual "romantic" or sexual relationship. This policy applies to all employees without regard to the gender or sexual orientation of the individuals involved.

Although Company has no prohibition against employing relatives of current employees or individuals involved in a dating relationship with current employees, we are committed to monitoring situations in which such relationships exist in order to avoid conflicts of interest, the appearance of conflicts of interest, favoritism, harassment, or other negative impact on Company, its employees and its customers.

## Outside Employment

An employee may hold a job with another organization that is not a competitor of Company as long as he or she satisfactorily performs his or her job responsibilities with Company. All employees will be judged by the same performance standards and will be subject to Company's scheduling demands, regardless of any existing outside work requirements.

It is important that another job position does not interfere in any way with an employee's primary job position with Company. If another job position creates a potential conflict of interest, the employee may be asked to terminate the outside employment if he or she wishes to remain with Company. Outside employment will present a conflict of interest if it has an adverse impact on Company.

## Non-Disclosure

The protection of confidential operational business information and trade secrets is vital to the interests and the success of Company. Such confidential information includes, but is not limited to, the following examples:

- Computer processes
- Computer programs and codes
- Customer lists
- Customer preferences
- Financial information
- Marketing strategies
- New materials research
- Pending projects and proposals
- Proprietary production processes
- Scientific data
- Scientific formulae
- Technological data

All employees may be required to sign a non-disclosure agreement as a condition of employment. Employees who improperly use or disclose Company trade secrets or confidential operational business

information will be subject to disciplinary action, up to and including termination of employment and legal action, even if they do not actually benefit from the disclosed information.

## Introductory Period

All new and rehired employees work in an "introductory" status for the first 30 calendar days after their date of hire.  Employment may be terminated at any time, with or without cause, either during or after this period should such termination be deemed necessary or appropriate by the employee or Company.  Upon completion of this period, eligible employees will receive the benefits described in this Handbook.

Our primary objective is to have employees project a professional image while taking advantage of more casual or relaxed fashions. Casual dress offers a welcome alternative to the formality of typical business attire.

However, not all casual clothing is appropriate for the office. Casual business wear means clean, neat, professional clothing. If you are considering wearing something and you are not sure if it is acceptable, choose something else or inquire first.

Listed below is a general overview of acceptable casual business wear as well as a listing of some of the more common items that are not appropriate for the office. Obviously, neither group is intended to be all-inclusive. Rather, these items should help set the general parameters for proper casual business wear and allow you to make intelligent judgments about items that are not specifically addressed.

Examples of acceptable casual business wear include:

- Slacks, jeans, jogging suits, or dress shorts
- Casual dresses or skirts
- Casual shirts and blouses, polo shirts, turtlenecks, sweaters
- Loafers, deck shoes, boots, athletic shoes, flats and dress sandals

Examples of inappropriate clothing items that should not be worn on casual days include:

- Jeans that are excessively worn or faded
- Sweatpants or shorts
- T-shirts or sweatshirts with offensive messages or images
- Tank tops, midriffs, visible undergarments, slippers, thong slippers and pool wear

On occasion, we may announce dress-down days where looser, even more informal clothing can be worn in order to allow you to enjoy a special occasion, better tolerate excessive heat conditions, or more comfortably organize your work area.

For some, traditional business attire may simply remain a more favored option on casual days. The choice will be yours. We hope and fully expect that casual days will help make our workplace more enjoyable and productive.

## Return of Property

Any Company property issued to you, such as keys, tools, cell phones or any other items issued must be returned to Company at the time of your termination. You will be responsible for any lost or damaged items.

Employees are responsible for all Company property, materials, or written information issued to them or in their possession or control. Employees must return all Company property immediately upon request or upon termination of employment. Company may take all action deemed appropriate under the law to recover or protect its property issued to employees.

## Appendix A

## ACKNOWLEDGEMENT OF RECEIPT OF HANDBOOK

I hereby acknowledge that I have received a copy of the Employee Handbook (Version, November 2008) for Pyro Spectaculars North, Inc. and have read and understand all of its provisions. I agree to abide by the provisions of this Employee Handbook at all times during my employment.

I understand that Pyro Spectaculars North, Inc. retains the right and sole discretion to modify, delete, or add to any of the policies set forth in the Employee Handbook, and that this may be done only in writing by either the Chief Executive Officer, the Executive Committee or the Board of Directors of Pyro Spectaculars North, Inc. I understand that no supervisor has the authority to modify, delete, or add to the policies in the Handbook, and that in the event of a conflict between the terms of the Employee Handbook and anything told to me by a supervisor or co-worker, the terms of the Employee Handbook shall govern.

I also understand that my employment with Pyro Spectaculars North, Inc. is on an at-will basis and is not for any specific period of time. This means that I am free to resign at any time and that Pyro Spectaculars North, Inc. has the right to terminate my employment at any time, with or without cause, and with or without advance notice. Employment at-will also means that the terms and conditions of my employment may be changed at any time, with or without cause and with or without advance notice, including but not limited to transfer, promotion, demotion, compensation, benefits, duties, work hours, and location of work. I further understand that I will continue to be an at-will employee at all times during my employment regardless of my job position, status, compensation, or length of employment. Pyro Spectacular North, Inc.'s discretionary use of any corrective action, counseling, or warning does not in any way change my at will employment status. I understand the only way in which Pyro Spectaculars North, Inc. employment at-will policy can be amended or modified is by a written agreement signed by me and either the Chief Executive Officer, the Executive Committee or the Board of Directors of Pyro Spectaculars North, Inc.

This acknowledgment represents the entire understanding between Pyro Spectaculars North, Inc. and me with respect to my at-will employment and supersedes any and all prior or contemporaneous oral, written, or implied agreements, understandings and representations regarding this matter.

_____
Employee Signature

_____
Employee Name (Print)

11/30/08
_____
Date of Receipt of Employee Handbook

12/5/2008
_____
Date of Signature

**A signed copy of this Acknowledgment of Receipt of Employee Handbook is to be submitted to the Office Manager within seven (7) days of receipt of the Employee Handbook.**

49

**EMPLOYEE ACKNOWLEDGEMENT FORM**

The Employee Handbook describes important information about Pyro, and I understand that I should consult my supervisor or the Office Manager regarding any questions not answered in the handbook. I have entered into my employment relationship with Pyro voluntarily and acknowledge that there is no specified length of employment. Accordingly, either Pyro or I can terminate our relationship at will, with or without cause, at any time, so long as there is no violation of applicable federal, state or local law.

Since the information, policies, and benefits described here are necessarily subject to change, I acknowledge that revisions to the handbook may occur, except to Pyro's policy of employment-at-will. All such changes will be communicated through official notices, and I understand that revised information may supersede, modify, or eliminate existing policies. Only the Chief Executive Officer, The Executive Committee or the Board of Directors of Pyro have the ability to adopt any revisions to the policies in this handbook.

Furthermore, I acknowledge that this handbook is neither a contract of employment nor a legal document. I have received the handbook, and I understand that it is my responsibility to read and comply with the policies contained in this handbook and any revisions made to it.


EMPLOYEE'S NAME (printed): _Steve Souza_

EMPLOYEE'S SIGNATURE: _Steve Souza_

DATE: _February 11, 2002_