1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   PYRO SPECTACULARS
     NORTH, INC. et al.,

11
                    Plaintiffs,                    No. CIV S-12-0299 GGH
12          v.

13   STEVEN SOUZA,

14
                    Defendant.                     ORDER
15   _____/

16          Presently pending before the court is plaintiffs Pyro Spectaculars, Inc.; Pyro

17   Spectaculars North, Inc.; and Pyro Events, Inc.'s ("PSI") motion for a preliminary injunction,

18   which came on for hearing before the undersigned on March 15, 2012.  (Dkt. Nos. 34, 35.)[1]

19   Defendant Steven Souza filed an opposition (dkt. no. 47) and PSI filed a reply brief (dkt. no. 72).

20   Both PSI and defendant also submitted copious declarations, exhibits, and supplemental briefing

21   for the court's review.  At the hearing, Kurt Kappes and Jennifer Holly appeared on behalf of PSI

22   and Susan Sheridan and Heather Messenger appeared on behalf of defendant Steven Souza.

23   After considering the papers in support of and in opposition to the motion, the parties' oral

24   _____

25          [1] All present parties have consented to proceed before the undersigned pursuant to 28
     U.S.C. § 636(c), and the case has been referred to the undersigned for all further proceedings and
26   entry of final judgment.  (Dkt. Nos. 12, 13, 18.)

                                              1

1  argument, and the applicable law, the court now issues the following order preliminarily

2  enjoining defendant Souza and those acting in active concert or participating with him in the

3  misdeeds detailed herein.

4  BACKGROUND FACTS[2]

5          PSI is a business originally started by the Souza family in the early 1900s and is

6  currently one of the largest fireworks production companies in the United States.  (Dkt. No. 36 at

7  2.)  Notwithstanding its size, PSI remains a tight-knit, family-operated and managed business.

8  (Id.)  PSI states that its success in the commercial market is highly dependent on its established

9  relationships with customers, vendors, and pyrotechnic operators.  (Id.)  PSI employs

10  commissioned sales executives to market and sell pyrotechnic displays and services to its

11  customers, which are often ongoing customers that purchase fireworks displays regularly from

12  PSI.  (Id.)

13          According to Ian Gilfillan, PSI's Executive Vice President and husband of Nancy

14  Souza, PSI has compiled its list of customers over the decades of its business from advertising,

15  website contacts, publicity, customer referrals, and other sources of leads that have been gathered

16  and forwarded to its account executives to make a sale for PSI.  (Dkt. No. 36 at 3.)  Customer

17  lists include "the name, address, and phone number of the customer; the 'contact person'; the

18  amount of money previously spent; line item budgets and breakdown of costs of the displays the

19  client purchased; and a breakdown of the specific products used in the individual displays, and a

20  listing of every pyrotechnic operator PSI used for different accounts."  (Id.)  It also includes

21  "customer feedback, complaints and customer preferences, site surveys concerning the size of the

22  fireworks that can be shot in the customer's area, notes about how to improve the customer's

23

24          [2] The court does not exhaustively set forth all the facts and evidence, disputed and
undisputed, presented by the parties.  Instead, the court only outlines some necessary background

25  facts and summarizes evidence that the court finds most persuasive for purposes of adjudicating
this motion.  Any factual findings in this order are for purposes of the motion for preliminary

26  injunction only and do not constitute ultimate findings of fact in the case.

shows in the future, as well as special requirements, preferences and procedures of the authorities

that have jurisdiction over the displays." (Id.)  Furthermore, "PSI has compiled lists of

pyrotechnic operators, their experience, training, qualifications and requirements, as well as a list

of Hazardous Materials Drivers and their experience, training, qualifications and requirements,

among other lists that it keeps confidential." (Id.)  These lists and information were stored in a

program on PSI's company database known as the "Booking Form" program.  (Dkt. No. 37 at 2;

see also Dkt. No. 45-6 at 37-38.)

On or about November 1, 1995, PSI hired defendant Steven Souza as an account

executive.  (Dkt. No. 3-2 at 2.)  Defendant was hired both to serve PSI's existing customers and

accounts as well as to seek additional accounts.  (Id.)  His responsibilities included the marketing

and sales of pyrotechnic displays and show production for Northern California and Hawaii.  (Id.)

Mr. Gilfillan passed this territory on to defendant when he moved up in position with PSI.  (Dkt.

No. 36 at 2.)  PSI expended resources for defendant to visit and develop new and existing PSI

clients, and throughout his career at PSI, defendant enjoyed access to PSI's business information,

data, and documents.  (Id.)  Indeed, defendant admitted that he learned all of his pyrotechnics

customer contact information through his employment at PSI.  (Deposition of Steven Souza

["Steven Souza Depo"] 30:5-19, 32:17-20, Dkt. No. 45-1 at 14-15.)  Defendant's access to the

company database was limited to the "Booking Form" program.  (Dkt. No. 37 at 2.)

Shortly after being hired, on November 8, 1995, defendant signed a document

titled "Pyro Spectaculars, Inc. Account Executives Duties and Responsibilities - 1994" which

provided in part:

> Account executives agree that all account or customer lists, trade
> secrets, unique display designs or knowledge gained are the
> exclusive property of Pyro Spectaculars, Inc. and the Account
> Executive hereby waives any rights therein.  Account Executives
> further agree that they will not divulge any knowledge, trade
> secrets, formulas, patents or unique display designs to anyone
> outside Pyro Spectaculars, Inc.

(Dkt. No. 46 at 26-30, ¶ 12.)  During his employment, defendant also signed and acknowledged

multiple versions of PSI's employee handbook, including the PSI Employee Handbook issued

November 2008, which plaintiff received on November 30, 2008 and signed on December 5,

2008.  (See e.g. dkt. nos. 45-2 at 9, 45-3 at 36.)  Section One of the PSI Employee Handbook

issued November 2008 provides, in part:

> The protection of confidential business information and trade
> secrets is vital to the interests and the success of Company.  Such
> confidential information includes, but is not limited to, the
> following examples:
>
> • Computer processes
> • Computer programs and codes
> • Customer lists
> • Customer preferences
> • Financial information
> • Marketing strategies
> • New materials research
> • Pending projects and proposals
> • Proprietary production processes
> • Scientific data
> • Scientific formulae
> • Technological data
>
> All employees may be required to sign a non-disclosure agreement
> as a condition of employment.  Employees who improperly use or
> disclose Company trade secrets or confidential operational
> business information will be subject to disciplinary action, up to
> and including termination of employment and legal action, even if
> they do not actually benefit from the disclosed information.

(Dkt. No. 45-4 at 2-3.)  Section 7 of that handbook also states, in pertinent part, that:

> Employees are responsible for all Company property, materials, or
> written information issued to them or in their possession or control.
> Employees must return all Company property immediately upon
> request or upon termination of employment.  Company may take
> all action deemed appropriate under the law to recover or protect
> its property issued to employees.

(Dkt. No. 45-4 at 36.)  By signing the acknowledgment of receipt of handbook form, defendant

acknowledged that he read and understood all of its provisions.  (Dkt. No. 45-3 at 36.)

Around the first week of December 2011, defendant decided in his own mind to

resign from PSI.  (Steven Souza Depo 77:2-9, Dkt. No. 45-1 at 38.)  However, he must have been

1 seriously considering such a move as somewhat before that, in November 2011, defendant

2 downloaded and printed 52 individual customer Booking Forms from the Booking Form

3 program.  (Dkt. Nos. 37 at 4 & 37-1.)  In discussions with his then-prospective new employer

4 and PSI competitor, J&M Displays/Hi-Tech FX, LLC, defendant projected that he could bring

5 approximately $500,000 - $600,000 in client revenue to the table, 70-80% of which would be

6 attributable to existing PSI customers.  (Steven Souza Depo 139:5-10, 140:15-25, 145:10-20,

7 147:22-148:5, Dkt. No. 46 at 9-10, 13-15.)  Defendant later acknowledged that J&M

8 Displays/Hi-Tech FX, LLC had only a few customers in Northern California prior to his

9 resignation from PSI.  (Steven Souza Depo 137:25-138:2, 138:22-24, 143:19-144:15, Dkt. No.

10 46 at 7-8, 11-12.)  He also stated that he had not heard of J&M Displays prior to J&M Displays

11 recruiting him, was not aware of any advertising by J&M Displays in California, and that J&M

12 Displays were not hiring any other sales people in California apart from defendant.  (Steven

13 Souza Depo 154:6-19, Dkt. No. 45-2 at 1.)

14          Defendant actually tendered his resignation on January 14, 2012, to be effective

15 on January 16, 2012.  (Dkt. No. 3-2 at 2.)  On January 16, 2012, he allegedly informed PSI

16 Assistant Office Manager, Cindy Allie, that he had no other employment lined up.  (Dkt. No. 3-5

17 at 2.)  However, by that time defendant had already signed an employment contract with J&M

18 Displays/Hi-Tech FX, LLC[3] on January 14, 2012, which actually overlapped his employment

19 with PSI by two days.  (Steven Souza Depo 173:14-175:4, Ex. 30, Dkt. Nos. 45-2 at 3-5 & 46 at

20 31-34.)  Defendant purportedly told Ms. Allie that she may not want to keep in touch with him

21 after he takes business away from PSI.  (Dkt. No. 3-5 at 2.)  Defendant's wife, Sherry Souza, also

22 informed a PSI employee that she hated defendant's family and that defendant and her would

23 "take as many shows as we can."  (Sherry Souza Depo 35:20-37:7, Ex. 36, Dkt. No. 45-6 at 11-

24

25          [3] Defendant's employment agreement is technically with Hi-Tech FX, LLC.  (Dkt. No. 46
at 31-34.)  However, J&M Displays is apparently the parent company of Hi-Tech FX, LLC and
defendant is designated as the Vice President of the West Coast Region for J&M Displays West.

26 (See Dkt. No. 36-1.)  Accordingly, the court refers to both entities as defendant's employers.

5

1   13, 28.)

2   Furthermore, shortly after defendant's resignation, PSI started receiving reports

3   from some of its customers that defendant had been contacting them and soliciting their business

4   on behalf of his new employers.  (Dkt. Nos. 3-1 at 2; 3-3 at 2-3; 3-7 at 2-3; 3-8 at 6-7; 36 at 3-4;

5   36-1.)  Mark Silveira, PSI's Madeira Facilities Manager, also reported that, around mid-

6   December 2011, defendant had asked him who built PSI's fireworks racks, adding that he was

7   starting his own company and looking for a supplier.  (Dkt. No. 3-3 at 2.)

8   In light of this information, PSI retained a computer forensics expert to analyze

9   defendant's former PSI-assigned laptop.  The forensics report indicated that, on January 14, 2012

10  (the date of his resignation), defendant transferred over 60 PSI files from his PSI-assigned laptop

11  to a Western Digital external hard drive and to additional USB drives.  (Dkt. Nos. 3-6 at 3-4; 24

12  at 2-3.)  Thereafter, a wiping software called "Disk Redactor" was used to delete and write over

13  several computer files on the PSI-assigned laptop.  (Dkt. No. 3-6 at 4-5.)  It was later established

14  that defendant retained the services of a computer expert to help him delete various files and

15  folders from his PSI-assigned laptop.  (Dkt. No. 45-6 at 44-55.)  Despite the deletion, the

16  computer forensics expert was able to recover the names of some of the files transferred, which

17  were mostly concerning specific PSI clients and projects.  (Dkt. No. 3-6 at 4-5.)

18  Additionally, it is undisputed that defendant retained an older version of PSI's

19  Booking Form program and accessed it after his resignation.  (Steven Souza Depo 108:1-109:8,

20  Dkt. No. 45-1 at 46-47.)  He kept a separate Excel database of PSI customer and show

21  information that was derived from PSI documents and databases.  (Steven Souza Depo 38:4-

22  40:15, Dkt. No. 45-1 at 17-19.)  Defendant also admitted that he accessed and funneled

23  information from PSI Booking Forms to Mark Johnson at J&M Displays to prepare proposals to

24  customers on behalf of J&M Displays, even though defendant was no longer a PSI employee and

25  knew that it was something he was not permitted to do.  (Steven Souza Depo 110:15-112:14,

26  Dkt. No. 46 at 4-6.)  Defendant further testified as follows:

| | | |
|---|---|---|
| 1 | Q. | And how many proposals did you make in January after you left? |
| 2 | A. | Probably 20. |
| 3 | Q. | And how were you able to make so many proposals so quickly? |
| 4 | A. | Get my information and – I didn't make the proposal.  J&M – Mark at J&M made the proposal.  I fed him the |
| 5 | | information.  He could probably put out four or five, six a day out of their system. |
| 6 | | |

(Steven Souza Depo 206:3-11, Dkt. No. 46 at 23.)  This deposition testimony was further

corroborated by PSI's computer forensics expert, whose analysis of one of defendant's personal

computers revealed multiple contracts and proposals from J&M Displays to PSI customers

within 2 weeks of defendant's resignation from PSI.  (Dkt. No. 38 at 2.)  Some of these proposals

from J&M Displays had a similar format to PSI's previous proposals and offered slightly more

product for the same budget.  (Dkt. No. 45 at 3.)

Defendant also testified that he called, e-mailed, and visited several PSI customers

in person since he resigned from PSI, using the above-mentioned Excel database of PSI customer

information.  (Steven Souza Depo 115:19-24, 116:14-117:2, Dkt. No. 45-1 at 48-50; Steven

Souza Depo 155:2-16, Dkt. No. 45-2 at 2; Dkt. No. 45-5 at 51; Steven Souza Depo 200:17-

201:5, Dkt. No. 46 at 19-20.)  Defendant's wife, Sherry Souza, who is herself a pyrotechnics

operator and has shot shows for PSI in the past, assisted defendant with addressing and mailing

cards to customers.  (Sherry Souza Depo 28:19-30:25, Dkt. No. 45-6 at 5-7; Dkt. No. 49 at 1, 3.)

She also indicated that she had discussions with individuals at J&M, including Brian Panther and

Mark Johnson, regarding expenses for a pyrotechnics show for a former PSI customer.  (Sherry

Souza Depo 32:2-33:25, Dkt. No. 45-6 at 8-9.)

PSI claims that, in the weeks since defendant's resignation, at least 6 of its

customers have or may have signed contracts with J&M Displays.  Moreover, J&M Displays is

apparently offering a 5% increase in product for the same price if a customer is willing to sign a

multi-year agreement.  (Steven Souza Depo 204:4-23, Dkt. No. 46 at 22.)  PSI contends that

1    unless defendant is enjoined, his conduct will continue to damage PSI's business, goodwill, and

2    reputation.

3    BRIEF PROCEDURAL HISTORY

4            PSI filed this action on February 3, 2012.  (Dkt. No. 2.)  The operative complaint

5    asserts claims for violation of the Computer Fraud and Abuse Act (claim based on federal law);

6    violation of California Penal Code section 502; breach of contract; breach of loyalty; breach of

7    the implied covenant of good faith and fair dealing; misappropriation of trade secrets; tortious

8    interference with prospective economic relationship and economic advantage; unfair business

9    practices; and conversion.  (Dkt. No. 2.)  Several rounds of applications for expedited discovery

10   followed.  After the parties conducted expedited discovery, including computer forensic

11   examinations and depositions, PSI filed the instant motion for a preliminary injunction which is

12   focused upon the trade secrets state law claim.

13           On March 16, 2012, after the hearing on PSI's motion for a preliminary

14   injunction, the court issued an interim injunctive order pending issuance of a final order on the

15   motion for a preliminary injunction.  (Dkt. No. 92.)  That order essentially required defendant to

16   collect all PSI documents, databases, and information in his actual or constructive possession, or

17   the actual or constructive possession of those acting in concert with him or in active participation

18   with him, and produce these to chambers.  It also required defendant to certify in a declaration

19   that no copies of PSI documents, databases, and information remain in his actual or constructive

20   possession, or the actual or constructive possession of those acting in concert with him or in

21   active participation with him, including but not limited to Sherry Souza, Mark Johnson, Brian

22   Panther, J&M Displays and its officers and employees, and Hi-Tech FX, LLC and its officers and

23   employees.  (Id.)[4]

24   \\\\\

25   _____

26           [4] For the specific requirements imposed by that order, the parties shall reference the
     court's March 16, 2012 order.  (See Dkt. No. 92.)

1    The court now proceeds to a complete analysis of the merits of PSI's motion and

2    the formulation of a final preliminary injunction.

3    DISCUSSION

4    Applicable Legal Standard

5    "A preliminary injunction is an extraordinary remedy never awarded as of right."

6    Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).  Instead, it "may only be

7    awarded upon a clear showing that the plaintiff is entitled to such relief."  Id. at 22.  "The proper

8    legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to

9    succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

10   relief, that the balance of equities tips in his favor, and that an injunction is in the public

11   interest.'"  Stormans, Inc. v. Selecky, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting Winter, 555

12   U.S. at 20).  "In each case, courts must balance the competing claims of injury and must consider

13   the effect on each party of the granting or withholding of the requested relief."  Winter, 555 U.S.

14   at 24 (internal quotations omitted).

15   A Ninth Circuit panel has found that post-Winter, this circuit's sliding scale

16   approach or "serious questions" test survives "when applied as part of the four-element Winter

17   test."  Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131-32 (9th Cir. 2011).  "That

18   is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the

19   plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that

20   there is a likelihood of irreparable injury and that the injunction is in the public interest."  Id. at

21   1132, 1135.

22   Likelihood of Success on the Merits

23   PSI first argues that it is likely to succeed on the merits of its claim of

24   misappropriation of trade secrets.  Under the California Uniform Trade Secrets Act ("CUTSA"),

25   "misappropriation" means:

26   (1) Acquisition of a trade secret of another by a person who knows

or has reason to know that the trade secret was acquired by
improper means; or

(2) Disclosure or use of a trade secret of another without express or
implied consent by a person who: (A) Used improper means to
acquire knowledge of the trade secret; or (B) At the time of
disclosure or use, knew or had reason to know that his or her
knowledge of the trade secret was: (i) Derived from or through a
person who had utilized improper means to acquire it; (ii)
Acquired under circumstances giving rise to a duty to maintain its
secrecy or limit its use; or (iii) Derived from or through a person
who owed a duty to the person seeking relief to maintain its
secrecy or limit its use; or (C) Before a material change of his or
her position, knew or had reason to know that it was a trade secret
and that knowledge of it had been acquired by accident or mistake.

Cal. Civ. Code § 3426.1(b). Either subsection (2)(B)(ii) or (iii) is applicable here. "'Improper

means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to

maintain secrecy, or espionage through electronic or other means." Cal. Civ. Code § 3426.1(a).

CUTSA authorizes courts to enjoin "[a]ctual or threatened misappropriation." Cal. Civ. Code §

3426.2(a).

Defendant's briefing confirms there is no dispute that defendant downloaded and

retained PSI documents and information after his resignation. Nor is there any dispute that he

funneled PSI documents and information, including PSI Booking Forms, to his new employer to

formulate proposals to PSI customers. Thus, assuming for the moment that the information

constituted a trade secret, the element of misappropriation is satisfied, because defendant

disclosed and used PSI documents and information without its consent, knowing that his

acquisition of such information gave rise to a duty not to unduly disclose it, or was acquired by

virtue of his former status as a PSI employee. Indeed, defendant's counsel conceded at oral

argument that the only issue is whether the information constitutes a trade secret.

For purposes of CUTSA, a trade secret is defined as follows:

[I]nformation, including a formula, pattern, *compilation*, program,
device, method, technique, or process that:

(1) Derives independent economic value, actual or
potential, from not being generally known to the public or to other

10

persons who can obtain economic value from its disclosure or use; and

        (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code § 3426.1(d) (emphasis added).

        Defendant argues that PSI's Booking Forms and Booking Form program contain information that is generally known to the public and not secret, and that PSI does not protect the information on its Booking Form program.  Both contentions will be addressed separately below.

*Secrecy of Information*

        Although PSI's Booking Form program also contains pyrotechnics operator and vendor information, the parties address most of their briefing to the secrecy of the specific customer information contained on individual Booking Forms and the program as a whole.

        In <u>Morlife, Inc. v. Perry</u>, 56 Cal. App. 4th 1514 (1997), the California Court of Appeal for the First District extensively summarized California law with respect to when a customer list can be protected as a trade secret:

> With respect to the general availability of customer information, courts are reluctant to protect customer lists to the extent they embody information which is readily ascertainable through public sources, such as business directories...On the other hand, where the employer has expended time and effort identifying customers with particular needs or characteristics, courts will prohibit former employees from using this information to capture a share of the market.  Such lists are to be distinguished from mere identities and locations of customers where anyone could easily identify the entities as potential customers...As a general principle, the more difficult information is to obtain, and the more time and resources expended by an employer in gathering it, the more likely a court will find such information constitutes a trade secret...The requirement that a customer list must have economic value to qualify as a trade secret has been interpreted to mean that the secrecy of this information provides a business with a substantial business advantage...In this respect, a customer list can be found to have economic value because its disclosure would allow a competitor to direct its sales efforts to those customers who have already shown a willingness to use a unique type of service or product as opposed to a list of people who only might be

1               interested...Its use enables the former employee to solicit both
more selectively and more effectively.

2

3    Id. at 1521-22.

4               Defendant asserts that PSI's customer identities are widely known throughout the

5    industry and easily ascertainable.  "A competitor can easily find very long lists of customers of

6    PSI through a very simple and swift search on Google.  A competitor certainly could contact the

7    Fire Marshall's office, call customers and operators, contact local fire jurisdictions or agencies,

8    but this is not necessary, as the Internet offers such a speedy method of learning the identities of

9    such a large number of entities that have purchased shows from PSI."  (Dkt. No. 47, Def.'s Opp.

10   at 10-11.)  In support of these assertions, defendant's and his wife's declarations attach numerous

11   permit applications and related documentation for PSI pyrotechnics shows done for private and

12   public entities in various counties obtained through public records requests.  (See e.g. Dkt. No.

13   48, Exs. B-G; Dkt. No. 49, Ex. G.)  The permit applications show relatively detailed information

14   regarding individual shows, including plot plans, customer names and contacts, as well as shell

15   counts and descriptions.  (Id.)  Sherry Souza's declaration also attaches PSI proposals, contracts,

16   and city council meeting minutes regarding shows put on for public entities found on the Internet,

17   and these documents often include the prices PSI charged for these shows.  (Dkt. No. 49, Ex. F.)

18   Furthermore, defendant points out that PSI itself provides information about its shows and

19   customers on its website.  (Dkt. No. 49, Ex. H.)

20               To be sure, if the identities and contact information of PSI's customers, operators,

21   and vendors were the only information at issue, the court would be inclined to agree with

22   defendant.  It is not very hard to determine which entities regularly have fireworks shows, and

23   these shows are often widely publicized.  It is also probably true that one can ascertain the names

24   of all licensed pyrotechnics operators in California, and that the names and contact information

25   for pyrotechnics vendors are available in public directories.  However, the true value of PSI's

26   Booking Form program lies in its comprehensive, if not encyclopedic, compilation of customer,

operator, and vendor information, both with respect to each individual customer Booking Form and in the aggregate.

As outlined above, it includes contact information for the "contact person" at each customer; detailed financial, costs, and budgeting information for shows; a breakdown of the specific products used in individual shows; customer special preferences and requirements; notes of customer complaints and how a customer's shows can be improved; as well as information regarding operators and Hazardous Materials Drivers, including their experience, training, qualifications, and requirements. (See Dkt. No. 36 at 3.) PSI compiled this information "over the decades of its business from advertising, website contacts, publicity, customer referrals, and other sources of leads that have been gathered and forwarded to its account executives, including Defendant, to make a sale for PSI." (Id.) It has been "developed at great expense and labor" and "gives PSI a competitive advantage in the industry." (Id.)

While defendant persuasively argues that many of the individual pieces of information in the Booking Forms program can be ultimately ascertained by requesting and scouring public records, calling customers and operators, and reverse engineering videos and CDs, that misses the point. The Booking Forms program provides a virtual encyclopedia of specific PSI customer, operator, and vendor information at a competitor's fingertips, allowing the competitor to solicit both more selectively and more effectively without having to expend the effort to compile the data. Morlife, Inc., 56 Cal. App. 4th at 1522. It is this type of compilation that may be entitled to trade secret protection. Another federal district court reached the same conclusion in a case involving remarkably similar facts and allegations:

> Customer lists containing merely public information that can easily be compiled by third parties will not be protected as trade secrets; however, where the party compiling the customer lists, while using public information as a source,...expends a great deal of time, effort and expense in developing the lists and treats the lists as confidential in its business, the lists may be entitled to trade secret protection...While the information contained on the lists and the notes is ultimately ascertainable from public sources, it is not readily ascertainable from public sources: A third party wishing to

1    duplicate the information could not do so without investing a
     significant amount of time, effort, and expense...."
2

3    Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc., 147 F. Supp. 2d 1057, 1062-63, 1066

4    (D. Kansas 2001) (involving former employee of a pyrotechnics company who started his own

5    competing business).[5]

6            Finally, defendant's argument that all of the information on PSI's Booking Forms

7    is readily available to the public is undercut by his own actions in this case.  If the information is

8    truly that readily available to the public, it raises the question of why it was necessary for

9    defendant to surreptitiously download, retain, and funnel the Booking Forms and other PSI

10   information to his new employer in the first place.

11           Accordingly, the court finds that PSI's Booking Forms and the Booking Forms

12   program likely "derives independent economic value, actual or potential, from not being

13   generally known to the public or to other persons who can obtain economic value from its

14   disclosure or use."  Cal. Civ. Code § 3426.1(d).

15                              *Efforts to Maintain Secrecy*

16           To establish that its Booking Forms and Booking Form program are trade secrets,

17   PSI must also show that they are "the subject of efforts that are reasonable under the

18   circumstances to maintain [their] secrecy."  Cal. Civ. Code § 3426.1(d).

19           PSI points out that it requires its employees to sign confidentiality agreements,

20   maintains its confidential information remotely on secure network servers, requires employees to

21   _____

22   [5] While not dispositive of the issue, the court observes that defendant's employment
     agreement with his new employer also recognizes much of the above-mentioned information as
     confidential business information.  (See Steven Souza Depo, Ex. 30, Dkt. No. 46 at 31-34
23   ("*Confidential Business Information* includes (i) information related to the promotion, sale,
     design, production or manufacture of the Company's products and services; (ii) information
24   related to the Company's processes, inventions and formulas (including inventions and formulas
     developed by the Employee during employment with the Company); (iii) information related to
25   the Company's customers, including customers' special requirements; and (iv) any other
     proprietary information that gives the Company the opportunity to obtain a competitive
26   advantage over competitors").)

                                           14

1    use passwords with minimum complexity requirements to access the company database, and

2    compartmentalizes data and limits access by geographic region and job function.  (Dkt. No. 37 at

3    2-3.)  PSI acknowledges that until March 2011, its older versions of the database software were

4    housed directly on PSI computers, thereby allowing defendant and other employees to download

5    and store Booking Form information directly on their computer hard drives.  (Dkt. No. 37 at 3.)

6    After recognizing the danger of this practice, PSI developed the new database system to house

7    confidential information remotely.  (Id.)  The new software seeks older versions of the software

8    and customer information on employee computers and removes it.  (Id.)

9              Defendant disputes that PSI protects the information on the Booking Form

10   program.  By reference to his own declaration and the declarations of several former PSI

11   employees and operators, defendant points to alleged lax security practices by PSI.  For example,

12   defendant states that many employees used their first names as their login and password to the

13   Booking Form program and that PSI did not instruct employees not to share passwords.  The

14   network servers were purportedly not kept behind locked doors.  PSI allegedly did not

15   sufficiently restrict access to the Booking Form program – printouts were sometimes left lying

16   around or not shredded, receptionists and some temporary employees were allowed access, and

17   on one occasion a receptionist allegedly provided several Booking Forms to an independent

18   contractor.  Additionally, PSI allegedly did not always ensure that electronic and paper copies of

19   its confidential information were returned by departing employees.  Furthermore, defendant

20   argues that PSI provides most of the information in its Booking Forms to independent contractor

21   pyrotechnic operators in their operator packets, with the exception of costs and financial

22   information.  An operator packet includes a work order, plot plan, permit application, customer

23   contact information, cue sheets, show music, fire jurisdiction information, a route plan for

24   transportation, an equipment list, the bill of lading, and the material safety data sheet.  Operators

25   do not sign a confidentiality agreement, share the operator packet information with their crew

26   members (who are not hired or approved by PSI), and often do not return these materials.  (See

1  Dkt. Nos. 48-49, 51-52, 54-61.)

2         While PSI's security practices are not perfect and these issues can certainly be

3  explored further in discovery and at trial, the court finds for purposes of this motion that PSI has

4  made reasonable efforts to maintain the secrecy of the information in its Booking Form program.

5  As an initial matter, many of the statements in the former employees' declarations regarding

6  PSI's internal practices were conclusory and of doubtful probative value given that most of these

7  former employees had not worked for PSI for several years or after PSI upgraded its software.  In

8  fact, several now work for PSI competitors.

9         Moreover, even if the court were to unquestioningly accept the facts proffered by

10  defendant and these former employees, a business is not required to turn itself into an

11  "impenetrable fortress" to protect its trade secrets.  E.I. duPont deNemours & Co. v. Christopher,

12  431 F.2d 1012, 1017 (5th Cir. 1970); MAI Systems Corp. v. Peak Computer, Inc., 991 F.2d 511,

13  521 (9th Cir. 1993) (finding that entity took reasonable steps to insure the secrecy of information

14  by requiring its employees to sign confidentiality agreements regarding trade secrets).  PSI

15  required defendant and other PSI employees to sign confidentiality agreements as well as

16  acknowledgments that they had received and read PSI's employee handbook, which outlines the

17  employee's obligations with respect to trade secret and confidential business information.  (Dkt.

18  No. 45-2 at 9; Dkt. No. 45-3 at 36; Dkt. No. 46 at 26-30, ¶ 12; Dkt. No. 86, Exs. A-F.)  The

19  unauthorized actions by some employees do not negate reasonable efforts to maintain the

20  confidentiality of its proprietary information.  See E.I. duPont deNemours & Co., 431 F.2d at

21  1017 ("We should not require a person or corporation to take unreasonable precautions to

22  prevent another from doing that which he ought not do in the first place.")

23         Additionally, although defendant makes much of the information provided to

24  operators in the operator packets, he concedes that operators were not provided costs, budgeting,

25  and other financial information regarding the customer, which here arguably constitutes the most

26  dangerous information to fall into the hands of a competitor.  Moreover, an operator's access to

1   information regarding a particular show is not comparable to having access to the entire Booking

2   Form program database (or at least for Northern California and Hawaii customers).

3              Therefore, the court finds, for purposes of this motion, that there is substantial

4   evidence that defendant misappropriated PSI's trade secrets, including PSI Booking Forms and

5   other proprietary information.  Accordingly, the court concludes that PSI is likely to succeed on

6   the merits of its misappropriation of trade secrets claim.  In light of this conclusion, it is

7   unnecessary for the court to consider at this junction whether PSI is likely to succeed on any of

8   its other claims in this litigation.

9                              Likelihood of Irreparable Harm

10             The court also finds that PSI has demonstrated that it is likely to suffer irreparable

11  harm in the absence of a preliminary injunction.  Ordinarily, economic injury is not considered

12  irreparable, because monetary damages are available as an adequate remedy.  Rent-A-Center, Inc.

13  v. Canyon Television & Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir. 1991).  However,

14  "intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as

15  irreparable harm."  Id.; see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832,

16  841 (9th Cir. 2001) (holding that evidence of threatened loss of prospective customers or

17  goodwill supports a finding of irreparable harm).

18             Here, defendant admitted that he funneled PSI documents and information,

19  including PSI Booking Forms, to his new employer to formulate proposals to PSI customers.

20  This conduct explicitly targets PSI's goodwill, and therefore supports the existence of irreparable

21  harm.  According to PSI, at least 6 customers have already transferred their accounts to J&M

22  Displays and/or Hi-Tech FX, LLC.  Furthermore, damage to a business's goodwill is often very

23  difficult to calculate.  MySpace, Inc. v. Wallace, 498 F. Supp. 2d 1293, 1305 (C.D. Cal. 2007).

24  Therefore, the court finds that PSI will likely suffer irreparable harm in the absence of a

25  preliminary injunction.

26  \\\\\

                                           17

1          Balance of the Equities

2          The court has already found that PSI is likely to suffer irreparable harm if

3 injunctive relief is not awarded.  As discussed in greater detail below, in light of the restrictions

4 of Cal. Bus. & Prof. Code § 16600, any injunction issued would be focused on preventing

5 defendant from unlawfully using PSI's trade secrets to solicit PSI's customers.  Such an order

6 would not cause any significant hardship to defendant, because it would essentially only require

7 him to abide by existing law regarding the unauthorized use of another's trade secrets.  Subject to

8 certain restrictions discussed below, defendant and his new employer will be allowed to lawfully

9 compete with PSI.  In any event, whatever harm defendant may suffer by such a narrow

10 injunction is slight when compared to the intangible harm PSI would suffer in losing the

11 goodwill of its customers built up with great effort over many years.  Accordingly, the court finds

12 that the equities tip significantly in favor of PSI.

13          Public Interest

14          "In exercising their sound discretion, courts of equity should pay particular regard

15 for the public consequences in employing the extraordinary remedy of injunction."  Winter, 555

16 U.S. at 24.  There are two competing public interests at issue in this case.  On the one hand,

17 California has a "settled legislative policy in favor of open competition and employee mobility,"

18 protecting "the important legal right of persons to engage in businesses and occupations of their

19 choosing."  Edwards v. Arthur Andersen LLP, 44 Cal. 4th 937, 946 (2008).  On the other hand,

20 the state also has a strong policy in favor of protecting trade secrets.  Retirement Group v.

21 Galante, 176 Cal. App. 4th 1226, 1237 (2009) ("An equally lengthy line of cases has consistently

22 held former employees may not misappropriate the former employer's trade secrets to unfairly

23 compete with the former employer").  As one California Court of Appeal put it, "[t]o be sure, we

24 acknowledge the important legal right of persons to engage in businesses and occupations of their

25 choosing...Yet also fundamental to the preservation of our free market economic system is the

26 concomitant right to have the ingenuity and industry one invests in the success of the business or

18

occupation protected from the gratuitous use of that 'sweat-of-the-brow' by others." Morlife,
Inc., 56 Cal. App. 4th at 1520.

Although an overbroad injunction would interfere with California's policy in
favor of open competition, employee mobility, and the right to pursue a business or occupation,
the court finds that an injunction specifically focused on preventing misuse of PSI's trade secrets
to solicit PSI's customers would serve the policy of protecting trade secrets while simultaneously
allowing lawful competition.

In sum, PSI has shown a likelihood of success on the merits, that irreparable harm
is likely in the absence of an injunction, that the balance of equities tips significantly in PSI's
favor, and that the public interest favors issuing injunctive relief.  What remains to be decided is
who will be bound by the injunction, the scope of the injunctive relief, and whether a bond
should be posted.

<u>Persons to be Bound by the Injunction</u>

Under Fed. R. Civ. P. 65(d)(2), an injunction may bind "only the following who
receive actual notice of it by personal service or otherwise: (A) the parties; (B) the parties'
officers, agents, servants, employees, and attorneys; and (C) other persons who are in active
concert or participation with anyone described in Rule 65(d)(2)(A) or (B)."  Defendant may
obviously be bound by any injunction as a party to the action.  However, although PSI has filed
an application to amend its complaint to add J&M Displays, Hi-Tech FX, LLC, Mark Johnson,
and Brian Panther as defendants (dkt. no. 68), that application is still under submission, and these
entities and individuals cannot presently be bound as parties.[6]

Nevertheless, as outlined above, the court finds that substantial evidence exists
that defendant's new employers, Hi-Tech FX, LLC and J&M Displays were acting in concert and
in active participation with defendant in accessing, obtaining, and/or using information from PSI

---

[6]  Indeed, all involved with Souza, and Souza himself, almost appear to be flaunting their misappropriation.

1   documents and databases, including PSI's Booking Form Program.  (See e.g. Steven Souza Depo

2   110:15-112:14, Dkt. No. 46 at 4-6; Deposition of Mark Johnson, 86:11-94:15, Dkt. No. 66-1 at

3   15-23.)  Accordingly, Hi-Tech FX, LLC and J&M Displays and their officers and employees,

4   including but not limited to Mark Johnson and Brian Panther, may be enjoined.

5           The court further finds that defendant's wife, Sherry Souza, was acting in concert

6   and in active participation with defendant.  She is a pyrotechnics operator who has shot shows for

7   PSI in the past, and she admitted that she assisted defendant with soliciting customers after his

8   resignation from PSI.  (Sherry Souza Depo 28:19-30:25, Dkt. No. 45-6 at 5-7; Dkt. No. 49 at 1,

9   3.)  She also indicated that she had discussions with individuals at J&M, including Brian Panther

10  and Mark Johnson, regarding expenses for a pyrotechnics show for a former PSI customer.

11  (Sherry Souza Depo 32:2-33:25, Dkt. No. 45-6 at 8-9.)  As such, Sherry Souza may also be

12  enjoined.

13              Scope of Injunctive Relief

14          As noted above, the court already issued an interim injunctive order essentially

15  requiring collection, production, and the subsequent destruction of any remnants of all PSI

16  documents, databases, and information in defendant's actual or constructive possession, or in the

17  actual or constructive possession of those acting in concert or active participation with defendant

18  (including Sherry Souza, Mark Johnson, Brian Panther, J&M Displays and its officers and

19  employees, and Hi-Tech FX, LLC and its officers and employees), as well as requiring a

20  certifying declaration to that effect.  (See Dkt. No. 92.)  That interim injunctive order will be

21  incorporated in the court's final injunctive order and will remain in full force and effect.

22          PSI further requests that the court enjoin defendant from doing business with any

23  PSI customer he learned of through his employment at PSI.  (See Dkt. No. 97 at 2.)  In light of

24  this request, the court specifically invited the parties to submit supplemental briefing with respect

25  \\\\\

26  \\\\\

20

1  to the import of Cal. Bus. & Prof. Code § 16600[7] and <u>Retirement Group v. Galante</u>, 176 Cal.

2  App. 4th 1226 (2009).

3          In <u>Galante</u>, the plaintiff TRG, an investment firm, sued the defendants, some of its

4  former affiliate advisors, who had established a competing business, for misappropriation of

5  trade secrets, which the defendants allegedly used to solicit the plaintiff's customers.  <u>Id.</u> at 1229.

6  TRG obtained a preliminary injunction enjoining numerous categories of conduct.  <u>Id.</u> at 1232.

7  Category 3 of the injunction enjoined defendants from "using in any manner TRG information

8  found solely and exclusively on TRG databases.  However, similar information found on servers,

9  databases and other resources owned and operated by other entities or businesses is excluded

10 from the injunction."  <u>Id.</u> at 1232.  Category 4 of the injunction prohibited the defendants from

11 "directly or indirectly soliciting any current TRG customers to transfer any securities account or

12 relationship from TRG to [defendants] or any broker-dealer or registered investment advisor

13 other than TRG."  <u>Id.</u>  On appeal, the defendants challenged only the injunctive relief granted by

14 Category 4, asserting that it violated <u>Edwards v. Arthur Andersen LLP</u>, 44 Cal. 4th 937 (2008).

15         The <u>Galante</u> court considered the two "competing strands of legal principles" in

16 California involving competitive conduct by a former employee.  <u>Id.</u> at 1233.  First, the court

17 examined Cal. Bus. & Prof. Code § 16600 and the California Supreme Court's relatively recent

18 <u>Edwards</u> decision.  <u>Galante</u>, 176 Cal. 4th at 1233-36.  It noted that <u>Edwards</u> had rejected the

19 "rule of reasonableness" in evaluating competitive restraints utilized in other jurisdictions, i.e.

20 the principle that only broad agreements that prevent a person from engaging entirely in his

21 chosen business, trade, or profession violate Cal. Bus. & Prof. Code § 16600.  <u>Id.</u> at 1235 (citing

22 <u>Edwards</u>, 44 Cal. 4th at 947-48).  It further noted that <u>Edwards</u> had declined to adopt the related

23 "narrow-restraint" exception discussed by the Ninth Circuit in <u>Campbell v. Board of Trustees of</u>

24 

25         [7] Cal. Bus. & Prof. Code § 16600 provides that "[e]xcept as provided in this chapter,
   every contract by which anyone is restrained from engaging in a lawful profession, trade, or
26 business of any kind is to that extent void."

1  Leland Stanford Junior University, 817 F.2d 499 (9th Cir. 1987).  Galante, 176 Cal. App. 4th at

2  1235 (citing Edwards, 44 Cal. 4th at 948).  Edwards had observed that, by concluding that

3  California courts have excepted from Cal. Bus. & Prof. Code § 16600 agreements that bar one

4  from pursuing only a small or limited part of the profession, the Campbell court had confused the

5  import of California case law. Id. at 1236 (citing Edwards, 44 Cal. 4th at 949-50).  The Galante

6  court acknowledged that "[a]lthough Edwards reaffirmed the broad California rule that

7  invalidates noncompetition agreements falling outside the statutorily-prescribed exceptions,

8  Edwards expressly stated it was not addressing the applicability of the so-called trade secret

9  exception to section 16600." Id. (citing Edwards, 44 Cal. 4th at 946 n.4.)

10         Second, the Galante court stated that "[a]n equally lengthy line of cases has

11  consistently held former employees may not misappropriate the former employer's trade secrets

12  to unfairly compete with the former employer.  Galante, 176 Cal. App. 4th at 1237.  However, it

13  emphasized that "a former employee may be barred from soliciting existing customers to redirect

14  their business away from the former employer and to the employee's new business *if the*

15  *employee is utilizing trade secret information* to solicit those customers...Thus it is not the

16  *solicitation* of the former employer's customers, but is instead the *misuse of trade secret*

17  *information*, that may be enjoined." Id. (emphasis in original)

18         The Galante court then synthesized the "competing strands" as follows:

19         We distill from the foregoing cases that section 16600 bars a court
       from specifically enforcing (by way of injunctive relief) a
20     *contractual* clause purporting to ban a former employee from
       soliciting former customers to transfer their business away from the
21     former employer to the employee's new business, but a court may
       enjoin *tortious* conduct (as violative of either the Uniform Trade
22     Secrets Act and/or the Unfair Competition Law) by banning the
       former employee from using trade secret information to identify
23     existing customers, to facilitate the solicitation of such customers,
       or to otherwise unfairly compete with the former employer.
24     Viewed in this light, therefore, the conduct is enjoinable *not*
       because it falls within a judicially-created "exception" to section
25     16600's ban on contractual nonsolicitation clauses, but is instead
       enjoinable because it is wrongful independent of any contractual
26     undertaking.

1    Galante, 176 Cal. App. 4th at 1238 (emphasis in original).

2            In light of these principles, the Galante court concluded that the injunctive

3    provisions of Category 4 "on its face violate Edwards and when viewed in counterpoise with the

4    injunctive provisions of Category 3, cannot rationally be upheld as an injunction limited in scope

5    to the only legitimate protection (i.e., enjoining the misappropriation of TRG's trade secrets) for

6    which injunctive relief may be issued." Galante, 176 Cal. App. 4th at 1238. It noted that,

7    "absent the provisions of Category 4, [the defendants] could compete with TRG for the business

8    of TRG's existing customers by employing all available resources and information *except* for

9    those materials (because it is found 'solely and exclusively on TRG's databases') constituting

10   protectable trade secrets. Accordingly, Category 4 adds nothing to further the legitimate scope of

11   protections (e.g. protection of TRG's trade secrets) to which TRG is entitled, and can only

12   operate to preclude the precise type of competition *Edwards* declares is otherwise permissible."

13   Id. at 1239.

14           In its supplemental briefing, PSI contends that Galante is distinguishable, because

15   it only considered whether a preliminary injunction could be entered in the context of specifically

16   enforcing a non-solicitation agreement in a contract. PSI argues that Cal. Bus. & Prof. Code §

17   16600 is not even triggered here, because PSI is not seeking to enforce a contractual non-

18   solicitation agreement, but instead seeks a remedy for defendant's likely violation of CUTSA,

19   and that Cal. Bus. & Prof. Code § 16600 does not constrain a court in equity from fashioning an

20   appropriate remedy for tortious conduct. (See Dkt. No. 96.)

21           While Category 4 of the injunction in Galante may have been at least partially

22   based on a contractual non-solicitation agreement,[8] the court declines to adopt such a narrow

23

24           [8] Although the Galante court focused its analysis on the language of the injunction and
     never extensively discussed the underlying non-solicitation agreement, it did refer to it when
25   comparing it to the agreement at issue in Edwards. See Galante, 176 Cal. App. 4th at 1234
     ("There, the employee (Edwards) signed a nonsolicitation agreement, substantively
26   indistinguishable from the non-solicitation agreement in this case....")

1    reading of Galante.  Galante extensively discussed law concerning misappropriation of trade

2    secrets by an employee and emphasized that the protection afforded in such cases should focus

3    on preventing the *misuse of trade secret information*, not the *solicitation* of former customers.

4    Galante, 176 Cal. App. 4th at 1237.  The opinion centered around how a court might provide

5    appropriate relief via an injunction, and the Galante court never stated that injunctions not based

6    on contractual clauses are entirely exempt from the policies embodied in Cal. Bus. & Prof. Code

7    § 16600.  While Cal. Bus. & Prof. Code § 16600 does not constrain a court in equity from

8    fashioning an appropriate remedy focused on the misappropriation of trade secrets, Galante

9    nevertheless stands for the proposition that a court should be highly cognizant of the important

10   policies embodied in Cal. Bus. & Prof. Code § 16600 when crafting an injunction.[9]

11           Accordingly, the court will not impose the overbroad restriction proposed by PSI,

12   enjoining defendant "from doing business with any PSI customer he learned of through his

13   employment at PSI."  (Dkt. No. 97 at 2.)  This is not a case involving a secret recipe or formula,

14   where the mere use of that recipe or formula in competition with a former employer in itself

15   would constitute misappropriation of a trade secret.  Instead, as discussed above, the identities

16   and contact information of PSI's customers are, in most cases, ultimately available to the public

17   or a competitor.  Thus, the court cannot grant the broad relief requested.  Nevertheless, for the

18   reasons discussed below, the court concludes that a narrow, time-limited non-solicitation

19   restriction is necessary to prevent defendant's misuse of PSI trade secret information in

20   competing with PSI.

21           First, given defendant's past conduct, the court has some concern that defendant

22   will not return all PSI trade secret and proprietary material pursuant to this court's order.  On

23   

24           [9] PSI also argues that Cal. Bus. & Prof. Code § 16600 by its terms only applies to
     contracts.  While this is true, the California Supreme Court has also indicated that "California
     settled public policy in favor of open competition, and rejected the common law rule of
25   reasonableness, when the Legislature enacted the Civil Code."  Edwards, 44 Cal. 4th at 945.  PSI
     has cited no authority for the proposition that this court may ignore established California policy
26   in fashioning an injunction premised on California law.

1  February 8, 2012, the court ordered defendant to produce all of defendant's and defendant's

2  wife's computers and other electronic storage media (including, without limitation, external hard

3  drives, thumb drives, Iphones, Blackberrys, etc.) for forensic examination no later than February

4  14, 2012. (Dkt. No. 15 at 6.)  The court further ordered defendant to file a declaration stating

5  that all applicable devices were turned over and made available for forensic examination

6  pursuant to the court's order and that there are no other applicable electronic storage media in

7  their possession, custody, or control.  (Id.)

8          However, to this day, defendant has failed to account for several thumb drives

9  onto which (the forensic examination revealed) he transferred information from his PSI-assigned

10  computer.  (See Dkt. No. 24.)  At his deposition, defendant also admitted that he had not turned

11  over all computers that he had in his possession as of February 14, 2012.  (Steven Souza Depo

12  61:2-65:2, Dkt. No. 45-1 at 26-30.)  In particular, he testified that although he had sold a

13  computer to a Jeff Shin, Mr. Shin had returned the computer to him in September-October, 2011

14  to have a "worm" on the computer fixed and that he had used it to go online, do e-mail, and "do a

15  little bit of work."  (Id. at 62:2-63:9.)  However, in his most recent declaration, defendant

16  curiously asserts that he retrieved that computer from Mr. Shin after February 9, 2012 and turned

17  it over to his counsel on February 24, 2012.  (Dkt. No. 80 at 1.)  These discrepancies, along with

18  plaintiff's surreptitious downloading of PSI documents and files, use of wiping software, and

19  subsequent destruction of electronic storage media cause the court to be skeptical that an

20  injunction requiring defendant to return all PSI documents, databases, and information will be

21  sufficient to protect against misuse of PSI's trade secrets.  This skepticism is reinforced by the

22  fact that defendant's probable misappropriation thus far has so tainted defendant's base of

23  knowledge that it would be very difficult, at least over the next several months, for defendant to

24  separate his general pyrotechnics information and skills from PSI's legitimate trade secrets when

25  competing with PSI.

26  \\\\\

1        Accordingly, the court will enjoin defendant, for a period of six months from the

2   date of this order, from directly or indirectly *initiating* contact with any current Northern

3   California and Hawaii PSI customers with whom he had contact or for whose accounts he had

4   responsibility while employed by PSI, for the purpose of encouraging, inviting, suggesting, or

5   requesting transfer of their business from PSI.  Notwithstanding the foregoing, if a PSI customer

6   initiates contact with defendant, defendant shall be permitted to respond to and accept business

7   from the customer.  Defendant shall also be permitted to continue dealings with former PSI

8   customers with whom defendant, J&M Displays, and/or Hi-Tech FX, LLC already have an

9   existing contract for services.  Defendant shall further be permitted to engage in marketing

10  efforts directed at the pyrotechnics show market as a whole, such as attending trade shows and

11  posting general advertisements.

12        Furthermore, these non-solicitation restrictions shall not apply to defendant's new

13  employers *provided that defendant has no direct or indirect involvement or input in the*

14  *solicitation of any PSI customers covered by this order*.  It is defendant – not his new employers

15  – who allegedly has significant relationships with PSI's customers and is best positioned to

16  misuse PSI's trade secrets.  Thus far, J&M Displays and Hi-Tech FX, LLC have not

17  demonstrated that they are unwilling to obey the court's orders.  Given that these employers have

18  been required to produce all PSI documents, databases, and information in their actual or

19  constructive possession that can potentially be misused, the court finds it unnecessary to further

20  limit their competitive efforts.  To the extent that proposals from J&M Displays and Hi-Tech FX,

21  LLC have already been actually communicated to PSI customers covered by this order with

22  defendant's input or assistance, but no agreement has yet been finalized, J&M Displays and Hi-

23  \\\\\

24  \\\\\

25  \\\\\

26  \\\\\

1   Tech FX, LLC may conclude those deals without any further involvement or assistance by

2   defendant.[10]

3         The court emphasizes that it is not imposing the non-solicitation component of the

4   injunction as an exception to the principles outlined in Galante – instead it is entirely consistent

5   with those principles.  Galante and Edwards have both acknowledged that non-solicitation

6   restrictions may sometimes be necessary as long as it is focused on protecting against the misuse

7   of trade secrets.  See Galante, 176 Cal. App. 4th at 1240; Edwards, 44 Cal. 4th at 946.  The

8   necessity of such a restriction necessarily turns on the facts of an individual case.  The court

9   notes that other federal district courts, with due regard for Galante and Cal. Bus. & Prof. Code §

10  16600, have sometimes found such narrow non-solicitation clauses appropriate to prevent the

11  misuse of trade secrets.  See e.g. Richmond Technologies, Inc. v. Aumtech Business Solutions,

12  2011 WL 2607158 (N.D. Cal. July 1, 2011); Fidelity Brokerage Services LLC v. McNamara,

13  2011 WL 2117546 (S.D. Cal. May 27, 2011).

14        Finally, the court notes that PSI also requests the appointment of a special master

15  or monitor to ensure compliance with this court's injunction.  Although PSI at the hearing

16  discussed the possibility of requiring defendant to somehow report his daily competitive

17  activities to the court, PSI first raised the issue of appointment of a special master or monitor in

18  its supplemental briefing.  It also suggests that defendant should be responsible for the costs

19  involved with such an appointment.  Defendant has had no opportunity to respond to PSI's

20  proposal.  In any event, the court finds that such an appointment would be unnecessarily

21  expensive and is not warranted at this stage of the litigation.  The discovery process in civil

22  litigation is quite often a sufficient way to monitor non-compliance with preliminary injunctions.

23  \\\\\

24  \\\\\

25

26      [10] Of course, PSI may seek damages from Souza, and/or added defendants, if use of PSI trade secrets were improperly part of the solicitation process.

1        Propriety of a Bond

2        Fed. R. Civ. P. 65(c) provides, in part, that "[t]he court may issue a preliminary

3    injunction...only if the movant gives security in an amount the court considers proper to pay the

4    costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

5    In this case, the narrow injunction to be entered will not preclude defendant from working in his

6    chosen occupation.  With respect to the six-month non-solicitation restriction, defendant will be

7    permitted to work with J&M Displays or Hi-Tech FX, LLC customers and potential customers

8    that are not covered by the terms of the injunction during that period.  J&M Displays and Hi-

9    Tech FX, LLC will even be permitted to solicit PSI customers covered by the non-solicitation

10   restriction without defendant's involvement.  There is also no present evidence that defendant

11   has been terminated, or will be terminated, from J&M Displays or Hi-Tech FX, LLC.

12   Accordingly, no bond will be required.  However, should defendant's employment circumstances

13   change, defendant will be permitted to return to the court to request the imposition of an

14   appropriate bond.

15   CONCLUSION

16       Accordingly, for the reasons outlined above, IT IS HEREBY ORDERED THAT:

17       1.  PSI's motion for a preliminary injunction (dkt. no. 34) is granted in part.

18       2.  The court's interim injunctive order issued March 16, 2012 (dkt. no. 92) is

19   hereby incorporated and remains in full force and effect, except as supplemented and/or modified

20   by this order.

21       3.  Defendant Steven Souza and those who have been identified as working in

22   active participation or in concert with him (including Sherry Souza, Mark Johnson, Brian

23   Panther, J&M Displays and its officers and employees, and Hi-Tech FX, LLC and its officers and

24   employees) are enjoined from possessing, using, disclosing, or transmitting any PSI trade secrets

25   or proprietary information, including but not limited to the contents of PSI's Booking Forms and

26   Booking Form program.  This does not include any information or documentation that defendant

and those acting in active participation or in concert with him have acquired entirely independent

of PSI documentation and databases utilized by defendant Steven Souza, or funneled by

defendant Steven Souza, to the above-mentioned persons or entities.

4.   Defendant Steven Souza is enjoined, for a period of six months from the date

of this order, from directly or indirectly *initiating* contact with any current Northern California

and Hawaii PSI customers with whom he had contact or for whose accounts he had responsibility

while employed by PSI, for the purpose of encouraging, inviting, suggesting, or requesting

transfer of their business from PSI.  Notwithstanding the foregoing, if a PSI customer initiates

contact with defendant, defendant shall be permitted to respond to and accept business from the

customer.  Defendant shall also be permitted to continue dealings with former PSI customers

with whom defendant, J&M Displays, and/or Hi-Tech FX, LLC already have an existing contract

for services.  Defendant shall further be permitted to engage in marketing efforts directed at the

pyrotechnics market as a whole, such as attending trade shows and posting general

advertisements.

5.   The non-solicitation restrictions identified in paragraph 4 above shall not

apply to J&M Displays, Hi-Tech FX, LLC, and their officers and employees *provided that*

*defendant has no direct or indirect involvement or input in the solicitation of any PSI customers*

*covered by this order*.  To the extent that proposals from J&M Displays and Hi-Tech FX, LLC

have already been actually communicated to PSI customers covered by this order with

defendant's input or assistance, but no agreement has yet been finalized, J&M Displays and Hi-

Tech FX, LLC may conclude those deals without any further involvement or assistance by

defendant.

\\\\\

\\\\\

\\\\\

\\\\\

1         6.  PSI's counsel shall immediately provide notice of this order and injunction to

2    all those found by the court to be in active concert with, or in active participation with, defendant

3    Souza.

4         IT IS SO ORDERED.

5    DATED: March 21, 2012

6                                 /s/ Gregory G. Hollows

                             UNITED STATES MAGISTRATE JUDGE

7    GGH/wvr

    Pyro.299.pi.wpd

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

30